[No. 8267–1–I.   Division One.   March 1, 1982.]

SEATTLE–FIRST NATIONAL BANK, *as Executor, Respondent,* v. BURT W. MARSHALL, ET AL, *Appellants.*

*Alfred J. Schweppe* and *Schweppe, Doolittle, Krug, Tausend & Beezer,* for appellants.

*William R. Roetcisoender,* for respondent.

DURHAM, A.C.J.—Defendants Burt and Nel Marshall appeal from a judgment ordering them to pay the estate of Blanche Agnethe Olsen $164,649.40; a figure representing her 20 percent partnership interest, plus $78,071.04 interest from the date of Olsen's death.

On July 1, 1950, Burt Marshall, Roy Marshall and Blanche Olsen executed a partnership agreement for the M & M Investment Company. The purpose of the partnership was to acquire land and lease it for billboard advertising. Each of the Marshalls contributed $4,000, and Olsen contributed $2,000. After Roy Marshall died, the partnership agreement was amended to give Burt Marshall an 80 percent interest in the partnership and Olsen a 20 percent interest in the partnership.

Blanche Olsen died October 29, 1971. Seattle–First National Bank (Seattle–First) was named executor of her will. In valuing Olsen's partnership interest as part of her estate, the bank valued the partnership's land only, without taking into account other assets or any liabilities. Olsen's 20 percent interest was valued at $151,055.37 for purposes of federal estate and state inheritance taxes.

The partnership agreement contains a buy–sell provision: in the event of the death of one of the partners, the surviving partners would purchase the interest of the deceased partner. Seattle–First offered to sell Olsen's interest to Marshall, the only surviving partner, for $151,000. In a letter dated September 30, 1974, Marshall strenuously objected, stating that the interest was overpriced because Seattle–First improperly computed the net worth of the partnership.

In June of 1973, Seattle–First obtained a summary judgment compelling Marshall to purchase the partnership interest in conformance with the partnership agreement. In January of 1978, Seattle–First filed an amended complaint to compel Marshall to purchase Olsen's interest pursuant to the partnership agreement. Finally, in July of 1979, Seattle–First moved for entry of a dollar amount of the judgment pursuant to the terms of the summary judgment.

The partnership agreement provides for the determination of the reasonable market value of a deceased partner's share. To compute the reasonable market value of the partnership interest, the partnership assets must be valued to determine the net worth of the partnership. The partnership agreement provides for appraisal of certain partnership assets, including real estate, in the event that the parties cannot agree on their current market value. To arrive at the value of the partnership's real estate, Marshall and Seattle–First each appointed appraisers pursuant to the partnership agreement. Because the two appraisers could not agree on the value of certain parcels of real estate, they appointed a third appraiser, again pursuant to the partnership agreement. The real estate owned by the partnership was appraised at $998,050.

Using an affidavit supplied by one of Seattle–First's officers, the trial court determined the net worth of the partnership and the reasonable market value of Blanche Olsen's interest in the partnership. Judgment was entered for Seattle–First as executor of the Olsen estate in the amount of $164,649.40. The trial court also awarded Olsen's estate 6 percent interest on the value of the partnership interest from October 29, 1971, the date of Olsen's death.

Marshall's first contention on appeal is that the trial court erred in not dismissing the case. Marshall argues that Seattle–First's motion for entry of a judgment in the amount of $164,649.40 was barred by the determination of a lower value for the partnership interest in the probate proceeding.

■ The theory under which Seattle–First would be prohibited from asserting a higher value for the partnership interest than was established in the probate proceeding is that of judicial estoppel. The term "judicial estoppel" is sometimes used to indicate estoppel arising from sworn statements made in the course of judicial proceedings. A sworn statement made in one proceeding does not necessarily operate as an estoppel in another proceeding involving different parties unless some other element of estoppel

is present. *See* 28 Am. Jur. 2d *Estoppel and Waiver* § 71, at 700–01 (1966).

The purposes of the doctrine are to preserve respect for judicial proceedings without the necessity of resort to the perjury statutes; to bar as evidence statements by a party which would be contrary to sworn testimony the party has given in prior judicial proceedings; and to avoid inconsistency, duplicity, and the waste of time. *See King v. Clodfelter,* 10 Wn. App. 514, 519, 518 P.2d 206 (1974); 2 L. Orland, Wash. Prac. § 382, at 434 (3d ed. 1972).

█ In support of his position, Marshall cites *Mueller v. Garske,* 1 Wn. App. 406, 461 P.2d 886 (1969). Mueller obtained a default judgment, then in a subsequent action denied that the judgment was taken by default. The court held that Mueller was estopped from denying that the judgment was taken by default:

> A party is not permitted to maintain inconsistent positions in judicial proceedings. It is not as strictly a question of estoppel as it is a rule of procedure based on manifest justice and on a consideration of orderliness, regularity and expedition in litigation.

*Mueller,* at 409. However, *Mueller* is inapplicable in this case. Mueller maintained positions that were diametrically opposed to one another; first he obtained a judgment by default, then denied that the judgment was taken by default. Seattle–First did not take such divergent positions in the probate proceeding and in the later action compelling Marshall to purchase Olsen's partnership interest.

A case more directly on point is *Northwest Trust & Safe Deposit Co. v. Thurston County,* 99 Wash. 564, 170 P. 125 (1918). Thurston County stipulated to the value of a water plant in a condemnation proceeding. The County then assessed the personal property of the water company at a value higher than the stipulated value. The water company challenged the assessment, arguing that the County could not say that the fair market value of the property exceeded the amount earlier stipulated. The Supreme Court held that the County was not precluded from asserting a higher

value for the property than the value stipulated in the condemnation proceeding.

Similarly, we find that Seattle–First is not estopped from asserting a higher value for Olsen's partnership interest than was established in the probate proceeding. We note that Marshall was not misled by Seattle–First's initial valuation of the partnership interest. No later than 1974, Marshall told Seattle–First that the $151,000 figure did not correctly represent the value of Olsen's partnership interest. Had Marshall relied on the initial valuation, the case for holding Seattle–First estopped by a proceeding to which Marshall was not a party would be much stronger.

Also, many of the reasons for applying the doctrine of judicial estoppel are absent. Although Seattle–First has asserted two different values for the partnership in two different proceedings, those positions are not inconsistent in the sense of being diametrically opposed. There is no showing that the different values established for Olsen's partnership interest represent duplicity or a lack of respect for judicial proceedings on the part of Seattle–First. Seattle–First was apparently in error in its initial valuation of the partnership interest. However, under the circumstances, it is not appropriate to correct that error by the application of an equitable doctrine which would deprive Olsen's estate of the full worth of her partnership interest.

Marshall next contends that the partnership agreement, as well as a court order, required that the appraisers' reports be sent to the partnership accountant, who would then determine the net worth of the partnership. Marshall made a similar argument to the trial court, which determined that it could perform the necessary calculations as well as an accountant. Using the affidavit of Yale W. Gifford, an officer of Seattle–First, the trial court determined the net worth of the partnership and the reasonable market value of Olsen's interest in the partnership. We agree with the trial court that it was unnecessary for the partnership accountant to be involved in the final stages of the valuation process.

Marshall bases his argument in part on a court order dated July 17, 1974. That order did indeed direct that the appraisers' reports be given to the partnership accountant, who would determine the net worth of the partnership. However, that order was modified on November 14, 1974 to state that Olsen's interest be valued pursuant to the partnership agreement.

The partnership agreement does not require the partnership accountant to make the determination of the partnership's net worth when a surviving partner is required to purchase a deceased partner's interest. Paragraph 14 of the partnership agreement provides that upon the death of a partner, the surviving partners shall purchase the deceased partner's interest at the "reasonable market value" of that interest at the time of the party's death. Paragraph 15 defines "reasonable market value" as "the value determined by multiplying the net worth of the partnership by the interest of the deceased or selling partner". Paragraph 15 also details the procedures to be used in valuing the partnership assets to determine net worth. No mention is made of an accountant's services. The partnership agreement does require the partnership accountant to determine net worth based on an appraiser's values when one or more of the partners desire dissolution during the lives of the partners. That the Marshalls and Olsen omitted a provision for determination of net worth by an accountant upon the death of one of the partners indicates that they did not intend the participation of the accountant when the surviving partners were to buy out the decedent's interest.

Marshall next contends that the value of the partnership interest should have been discounted by sales costs, minority interest, and capital gains taxes to be paid upon sale of the partnership interest. Although these discount factors are not mentioned in the partnership agreement, Marshall's position is that these discounts inhere in the concept of "current market value." The trial court stated that ordinarily it would allow discounts for sales costs and minority

interest. However, the trial court added that it was bound by the partnership agreement which does not mention such discounts in determining the value of a deceased partner's interest.

A buy–sell provision in a partnership agreement represents an effort to resolve the conflicts likely to arise upon the death of a partner:

> When planning the buy–sell provisions, the dual role of each partner becomes evident. He sees himself as the continuing partner; he also sees himself as the retired or deceased partner. As a potential continuing partner, he prefers a conservative valuation of the partnership. As a possible retired or deceased partner, he favors a more liberal valuation.

2 A. Willis, *Partnership Taxation* § 48.01, at 16–17 (2d ed. 1976). In addition, the bargaining power of the deceased partner's estate may be low at the time of death because of the lack of a market for the business interest and the estate's need for cash. California Continuing Education of the Bar, *Estate Planning for the General Practitioner* § 11.1, at 397 (1979).

A buy–sell provision in a partnership agreement thus represents a compromise rather than a precise formula for valuation. In light of the considerations underlying a buy–sell provision, it is not unreasonable to conclude that the parties to the M & M Investment Company partnership agreement intended an outgoing partner's interest to be valued as indicated, without discounts.

■ A careful reading of the partnership agreement supports the determination that the discounts Marshall seeks would be inappropriate in valuing Olsen's partnership interest. The partnership agreement mandates the purchase of a deceased partner's interest by the surviving partners. The purchase price of the partnership interest is the "reasonable market value" of that interest. "Reasonable market value" of the partnership interest is "deemed to be the value determined by multiplying the net worth of the partnership by the interest of the deceased or selling partner as

evidenced by the certificate of partnership". In determining the net worth of the partnership, the entire inventory of land, rather than merely the partnership interest, is to be priced at "current market value." Discounts might be appropriate if the partnership agreement called for the reasonable or current market value of the partnership interest without further definition of such value. However, the transaction is governed by the partnership agreement, rather than what might be appropriate in sales of other interests. We note that

> The agreement, whatever its form, is the heart of the partnership. One of the salient characteristics of partnership law is the extent to which partners may write their own ticket. Relations among them are governed by common law and statute, but almost invariably can be overridden by the parties themselves. As one court has long put it, the agreement is the law of the partnership.

A. Bromberg, *Partnership* § 5, at 43 (1968). Because the partnership agreement setting forth the method of valuing a deceased partner's interest makes no allowance for discount factors, the trial court properly refused to discount the value of Olsen's partnership interest.

Marshall next contends that the appraisal of "Parcel 9" should have been set aside as a matter of law. Marshall argues that the appraisal of Parcel 9 was purely speculative because the appraisers valued the land at $275,000 despite their recognition of a need for a soils analysis.

The partnership agreement provides for the appraisal of certain partnership assets, including real estate, in the event that the parties cannot agree on their current market value.[1] Marshall appointed Gail H. Halliday as his

---

[1]Paragraph 15 of the partnership agreement reads in pertinent part:

"(a) The inventory of land, sign boards, leases, contracts and other income producing property shall be priced at current market value wherever such market value can be readily and reliably ascertained or agreed upon and all other assets of that sort upon which the market value cannot be readily ascertained shall be appraised by appraisers selected by the parties as hereinafter provided in paragraph (d).

". . .

appraiser and Seattle–First appointed Verne T. Kelling as the estate's appraiser. The two appraisers could not agree on the value of Parcel 9. Pursuant to the partnership agreement, Halliday and Kelling appointed Robert H. Garmoe as a third appraiser.

In 1972, Kelling valued the property at $350,000 as of the date of Olsen's death. The assessor's true and full value for the property as of October 29, 1971 was $318,996. During his appraisal, Kelling learned from the city engineering department that portions of the property were potential slide areas. Kelling used sales of comparable pieces of property in valuing Parcel 9. In so doing, Kelling selected properties which had similar terrain and apparently similar soil conditions. In his report, Kelling stated that he made a "judgment reduction for the possibility of soils engineering needs and possible problems".

Halliday, the appraiser appointed by Marshall pursuant to the partnership agreement, initially appraised Parcel 9 at $350,000. Because Halliday was concerned that the property was a potential slide area, he reduced his appraisal to $275,000. Garmoe, the third appraiser appointed by Halliday and Kelling, valued the parcel at $200,000. Garmoe also acknowledged that the property was a potential slide area.

The trial court incorporated the appraisal of Parcel 9 in its findings of fact. An appellate court will sustain findings of fact which are supported by substantial evidence. *Bell v. Hegewald*, 95 Wn.2d 686, 628 P.2d 1305 (1981). The record contains ample evidence in support of the trial court's finding as to the value of Parcel 9. Each of the three appraisers took into account the slide potential of

---

"(d) For the determination of values of any assets to be appraised, the administrator, executor or personal representative of the seller or deceased party's estate shall select one appraiser, and the purchasers, or surviving parties, as the case may be, shall agree among themselves upon a designation of a second appraiser. In the event that the two appraisers so selected cannot agree upon the value of the several assets of the partnership, or if they otherwise so elect, the first two appraisers shall agree upon and select a third appraiser."

Parcel 9 in arriving at a value for the property. There is sufficient evidence to support the finding of fact as to the value of Parcel 9.

Lastly, Marshall challenges the trial court's award to Olsen's estate of $78,071.04 interest calculated at 6 percent per annum from the date of Olsen's death. Marshall contends that prejudgment interest was awarded in error because:

1. The estate accepted partnership profits, thus barring any right to interest on the value of the partnership interest;

2. The rule barring prejudgment interest on an unliquidated sum precludes the award.

█ Both of Marshall's contentions require a brief discussion of the applicable section of the Uniform Partnership Act, RCW 25.04.420:

> When any partner retires or dies, and the business is continued under any of the conditions set forth in RCW 25.04.410(1), (2), (3), (5), (6), or RCW 25.04.380(2)(b), without any settlement of accounts as between him or his estate and the person or partnership continuing the business, unless otherwise agreed, he or his legal representative as against such persons or partnerships may have the value of his interest at the date of dissolution ascertained, and shall receive as an ordinary creditor an amount equal to the value of his interest in the dissolved partnership with interest, or, at his option or at the option of his legal representative, in lieu of interest, the profits attributable to the use of his right in the property of the dissolved partnership: . . .

Thus, upon the death of a partner, unless otherwise agreed, the deceased partner's estate may have the value of her interest at the date of dissolution ascertained. The estate is then entitled to the value of the decedent's interest in the partnership. In addition, the estate is entitled to interest, or, at the option of the estate, profits attributable to the use of the decedent's right in the property of the dissolved partnership. *See Timmermann v. Timmermann*, 272 Or. 613, 538 P.2d 1254, 1261 (1975); A. Bromberg, *Partnership*

§ 86, at 496 (1968); Bromberg, *Partnership Dissolution—Causes, Consequences, and Cures,* 43 Tex. L. Rev. 631, 656 (1965).

The allowance of either profits or interest on the value of a deceased partner's interest serves at least two purposes. First, it is a means of compelling those continuing the business to quickly wind up the partnership affairs. Second, the continuing business has the use of the deceased partner's assets in the conduct of the business. *See* A. Bromberg, *Partnership* § 86, at 497 (1968).

Marshall argues that the estate has elected to receive profits attributable to the use of Olsen's right in the property of the dissolved partnership and is thus barred from receiving interest on the value of her partnership interest. Marshall bases his contention on the following convoluted set of facts. Blanche Olsen loaned $36,591.68 to the partnership. On March 7, 1973, the M & M Investment Company sent a check to the estate of Blanche A. Olsen in the amount of $600.21. A statement sent with the check, as well as a typed notation on the back of the check, said:

| | |
|---|---|
| Interest for year ending Dec. 31, 1972 | $1,716.85 |
| 20% Distribution of Profit—year 1972 | 1,454.95 |
| | $3,171.80 |
| Less check #3680, Sept. 15, 1972 | 2,571.59 |
| Balance Due | $600.21 |

A statement of the loan account dated October 15, 1973 lists the March 7, 1973 check for $600.21 as interest paid on Olsen's loan account. According to Yale W. Gifford, vice-president of Seattle–First, Marshall told him that payments made to Seattle–First as executor of Olsen's estate were to be applied to Olsen's loan to the partnership.

A receipt from Seattle–First dated July 14, 1972 acknowledges receipt of "[c]heck in the amount of $6,883.95 representing net income for Blanche Olsen's share of net income for 1971 from M & M Investment Co." and "[c]heck for proceeds of sale of Puyallup & Bay . . . for $15,898.40". Although the receipts from Seattle–First suggest that some

of the payments were received as distributions of income, all checks were recorded on the M & M Investment Company's statement of Olsen's loan account as payments on the loan. Marshall is thus estopped from asserting that the payments were anything but payments on Olsen's loan to the partnership. The loan payment of $600.21 was computed using $1,454.95, "20% Distribution of Profit" as a factor. Arguably the estate did receive a share of profits, albeit indirectly. However, once again the actual payment was credited to Olsen's loan account. Given the ambiguity surrounding the transaction, the relative insignificance of the alleged payment, and the decade that the estate has waited for Marshall's purchase of the partnership interest, we conclude that the estate did not elect to receive profits. Therefore, the estate is not barred from receiving interest on the value of the partnership interest pursuant to RCW 25.04.420.

Marshall further argues that the trial court erred in allowing prejudgment interest because the judgment was for an unliquidated sum. In Washington, interest prior to judgment is allowable (1) when an amount claimed is "liquidated" or (2) when the amount of an "unliquidated" claim is for an amount due upon a specific contract for the payment of money, and the amount due is determinable by computation with reference to a fixed standard contained in the contract, without reliance on opinion or discretion. *Prier v. Refrigeration Eng'r Co.*, 74 Wn.2d 25, 32, 442 P.2d 621 (1968).

We conclude that the rules set forth in *Prier* are inapplicable in this case. Disallowing interest would thwart the purposes of RCW 25.04.420. The statutory provision allowing interest on a deceased partner's interest would be meaningless if a surviving partner were allowed to dispute the value of the partnership interest, use the decedent's partnership property, and then be liable for interest only after a judgment has been rendered. If the parties wish to preclude prejudgment interest in the event of a dispute, they may so provide in the partnership agreement. *See*

352

RCW 25.04.420; Bromberg, *Partnership Dissolution— Causes, Consequences, and Cures,* 43 Tex. L. Rev., at 656 (1965).

The judgment is affirmed.

SWANSON and WILLIAMS, JJ., concur.

Reconsideration denied April 20, 1982.

Review denied by Supreme Court June 30, 1982.