[No. 66828-5-I.   Division One.   December 31, 2012.]

DONNA M. KELLAR, *Appellant*, v. THE ESTATE OF KENNETH L. KELLAR, *Respondent*.

*Michael L. Olver, Christopher C. Lee,* and *Kameron L. Kirkevold* (of *Helsell Fetterman LLP*), for appellant.

*Joseph J. Straus, Brian K. Keeley,* and *Colin J. Folawn* (of *Schwabe, Williamson & Wyatt PC*), for respondent.

¶1 APPELWICK, J. — After her husband's death, Donna Kellar challenged the validity of their prenuptial agreement. The trial court properly struck portions of her declaration made in violation of the dead man's statute, RCW 5.60.030, and properly concluded that the Estate had not waived the protections of the dead man's statute. We affirm denial of summary judgment to Donna on the fairness of the prenuptial agreement. We reverse the grant of the Estate's summary judgment motion on the theories of judicial estoppel and ratification. We reverse the denial of the Estate's summary judgment motion to find the prenuptial agreement procedurally fair and therefore valid. We affirm the trial court determination that Donna's challenge to the prenuptial agreement did not trigger a no-contest clause in her husband's will. We affirm the award of attorney's fees by the trial court.

## FACTS

¶2 Ken and Donna Kellar[1] began dating in October 2000. Ken proposed in June 2001 and again at the begin-

---

[1] To avoid confusion, we refer to Ken and Donna by their first names. No disrespect is intended.

ning of September 2001. Less than three weeks later, they flew to South Dakota and were married on September 19, 2001. At the time, Donna was working as a waitress and earning approximately $20,000-25,000 per year. She also owned and managed approximately six pieces of real property. In contrast, Ken was worth between $15 and $93 million.

Prenuptial Agreement

¶3 Prior to the wedding, Ken and Donna signed a prenuptial agreement. The agreement was initially drafted by Ken's attorney, Mark Packer. Packer sent Ken his first draft in June 2001. In a letter to Ken, Packer wrote that a "key element would be complete disclosure of the financial status of each party to the other before signing and proof thereof," and that Donna "needs to consult her own lawyer separately before signing anything." The draft prenuptial included a blank financial disclosure sheet.

¶4 On September 6, Ken and Donna met with mediator Ron Morgan. Neither party had counsel present. Donna is certain the draft prenuptial agreement was not in front of them at the mediation, and Morgan stated that he could not recall a prenuptial agreement being used at mediation. Morgan did not remember any specific financial documents being used at mediation; he did not recall any discussion of Ken's net worth or any list of assets or properties. He also stated that although he did not give legal advice, if he thought one party was being taken advantage of he would have pulled them aside and told them to get an attorney. After the mediation, Morgan memorialized Ken and Donna's agreement:

> [T]he parties agree that in the event they separate and/or file for divorce within four years of the date of their marriage, Wife shall receive from Husband the sum of $25,000 for each full year of marriage prior to said separation and/or filing. In the event they separate and/or file for divorce any time after four years of marriage, Wife shall receive from Husband the sum of

$500,000. In the event of Husband's death while they are married and living together, Wife shall receive $500,000 from Husband's estate or from such other fund that Husband may choose to create.

¶5 On September 11, Packer sent the draft agreement to Donna's attorney, Matt Peach. Donna claims she did not discuss Ken's assets with Peach, and Peach could not recall ever seeing a list of assets. Peach did not tell Donna what disclosures should be made prior to entering a prenuptial agreement. But, he did communicate with Packer after the mediation. He requested that the agreement be edited to accurately reflect that Donna would get $25,000 per year of marriage, regardless of how long they were married. Peach further told Packer:

> Donna also understood that anything acquired after the marriage was going to be community property and the prenuptial does not reflect that. If Ken wants to keep property he acquires in his name as separate property after the marriage Donna would accept that change in their agreement as outlined in the prenuptial because she loves him and does not wish to quibble. Anything that is put in both their names would be community property after the marriage occurs.

¶6 The agreement was revised, and Peach confirmed that the revised version reflected his client's intent. Ken and Donna signed the revised agreement on September 14, five days before the wedding. At the time they signed the agreement, Donna was unsure if they would actually get married.

¶7 The agreement provided that in the event of divorce or Ken's death, Donna would receive $25,000 for each year of marriage and an additional amount of $500,000 if they were married for at least four years before divorce or Ken's death. The $500,000 sum was to be paid out in 20 annual payments. The agreement also included reciprocal restrictions on spousal and community property rights. Specifically, they each waived their interest in community property, the right to pursue spousal maintenance, and the right

to statutory benefits such as spousal inheritance. Each spouse's separate property was to remain separate, and new assets acquired during the marriage were to remain separate property.

¶8 Ken and Donna each initialed a representation in the prenuptial agreement that

> [e]ach of the parties individually own certain property, the full nature and extent of which has been disclosed by each to the other, and the parties by affixing their initials to this paragraph represent and warrant that they have satisfied themselves as to the fullness and accuracy of the disclosure of said assets each to the other and the respective values thereof.

Despite this representation, the agreement does not include any lists or descriptions of assets. But, it is the only provision of the agreement that required their initials.

South Dakota Gaming Licenses

¶9 Ken's business dealings included operating a number of casinos in South Dakota. Under South Dakota law, an individual could hold licenses to operate only three casinos. Ken used trusted employees and relatives to obtain licenses to operate casinos beyond his individual quota.

¶10 In 2004, Ken's attorney, Richard Pluimer, applied for licenses on Donna's behalf. In January 2005, the South Dakota Gaming Commission (Gaming Commission) recommended denial of the application, because her marital community already owned the maximum number of licenses. Donna then sought declaratory relief. At a subsequent hearing, the Gaming Commission's primary concern was whether granting licenses to Donna could inure to the financial benefit of Ken. Pluimer and Donna sought to persuade the Gaming Commission that Ken and Donna kept separate assets.

¶11 The prenuptial agreement was presented, and Donna asserted she signed the agreement "because of a prior marriage, I had financial problems and I didn't want

that to happen again, and because Ken had a substantial amount of money, I'm sure he wanted to protect his assets as well. So we've always kept our assets and everything, our financials separate." Pluimer claimed that in entering a prenuptial agreement, "[e]ach recognized the separate property and the separate estate from the other, relinquished any financial claim or financial interest in the estate of the other, which would have included Donna relinquishing any claim against Ken's properties, whether they were gaming or otherwise." Donna further claimed that she had continued to own and develop a real estate business that was kept separate from Ken. She asserted that Ken had no right to control any of her bank accounts and that they did not have joint bank accounts. She stated that she did not intend to make any claim against any of Ken's separate properties and could not do so under the terms of the prenuptial agreement.

¶12 But, she conceded that she and Ken did jointly own one home together. Ken also gifted her money to purchase some of the properties in her real estate portfolio. The Gaming Commission's questioning focused on whether Ken's gifts to Donna clouded their separate and distinct financials, and made it inappropriate to grant Donna any licenses. Donna conceded that when she applied for the licenses, she did so for Ken so that he would have extra licenses at his disposal. Pluimer argued that the Gaming Commission could condition licenses on keeping any proceeds derived from the licenses totally segregated from Ken's interests. And, although Pluimer agreed there would be situations in which Ken could financially benefit from Donna's licenses, he argued those situations were subject to the Gaming Commission's future approval and consent.

¶13 The Gaming Commission ultimately awarded Donna the licenses. It stated that the parties had separate assets and that they are "protected and separated from the others by a valid prenuptial agreement."

## Ken's Will

¶14  In 2003, Ken signed a will that included a no-contest clause. The clause provided, "If anyone contests the provisions of this will, I leave said person the sum of $1.00 only." In 2007, he executed a new will, which included a broader no-contest clause:

> If any person brings any action, lawsuit, or claim against my estate, my Personal Representative, or any other beneficiary under my Will, which requests a resolution that would, if successful, increase the share of the claimant of my estate, then I direct that the claimant shall forfeit all interest in my estate, and the share that such person would have received under my Will shall be distributed as if he or she had died before me, leaving no descendants.

¶15  The new will also made significant gifts to Donna, including a house in her own name, the right to live in Ken's home for three years without paying expenses, and personal property. It changed the lump sum she was entitled to under the prenuptial agreement from $500,000 to $750,000, and stated that it would be paid out at $50,000 per year, instead of $25,000 per year. Finally, it provided for her to receive five percent of a charitable remainder trust each year, from a trust funded with $1 million.

## Trial Court Proceedings

¶16  Ken died in December 2009. Donna filed multiple petitions against the "Estate" in Whatcom County. As relevant to this appeal, one of those petitions challenged the validity of the prenuptial agreement.

¶17  Donna filed a motion for partial summary judgment, alleging that the prenuptial agreement was substantively and procedurally unfair as a matter of law. The Estate filed two motions for partial summary judgment, alleging that the agreement was procedurally fair, and that Donna's claim was barred under theories of judicial estoppel and ratification. The trial court denied both motions regarding

fairness but granted the Estate's motion to dismiss Donna's claim on estoppel grounds. In doing so, the trial court also struck portions of Donna's declaration that it determined violated the dead man's statute.

¶18 The parties then filed competing motions for summary judgment concerning the no-contest clause in Ken's will. The Estate also filed a motion for attorney fees, seeking to recover all costs it incurred in defending the validity of the prenuptial agreement. The trial court granted Donna's motion for summary judgment, determining that the no-contest clause was not triggered by her challenge to the prenuptial agreement. It granted the Estate's motion for attorney fees pursuant to the prenuptial agreement. It is unclear if the fee award includes fees incurred in the Estate's unsuccessful attempt to enforce the will's no-contest clause.

¶19 Both parties appeal. Donna claims that the trial court erred in denying her motion for summary judgment regarding fairness and in granting the Estate's motion for summary judgment on estoppel grounds. She also challenges the trial court's decisions to strike portions of her declaration and to award the Estate its attorney fees. The Estate argues that the trial court erred by denying its motion for summary judgment regarding procedural fairness and by granting Donna's motion for summary judgment regarding the no-contest clause in Ken's will.

## DISCUSSION

¶20 We review summary judgment orders de novo. *Hadley v. Maxwell*, 144 Wn.2d 306, 310-11, 27 P.3d 600 (2001). Summary judgment is proper only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Peterson v. Groves*, 111 Wn. App. 306, 310, 44 P.3d 894 (2002). We review the facts, and reasonable inferences drawn from the facts, in the light most favorable to the nonmoving party.

*CTVC of Haw. Co. v. Shinawatra*, 82 Wn. App. 699, 708, 919 P.2d 1243, 932 P.2d 664 (1996).

I. Dead Man's Statute

¶21 The dead man's statute provides:

No person offered as a witness shall be excluded from giving evidence by reason of his or her interest in the event of the action, as a party thereto or otherwise, but such interest may be shown to affect his or her credibility: PROVIDED, HOWEVER, That in an action or proceeding where the adverse party sues or defends as executor, administrator or legal representative of any deceased person, or as deriving right or title by, through or from any deceased person, or as the guardian or limited guardian of the estate or person of any incompetent or disabled person, or of any minor under the age of fourteen years, then a party in interest or to the record, shall not be admitted to testify in his or her own behalf as to any transaction had by him or her with, or any statement made to him or her, or in his or her presence, by any such deceased, incompetent or disabled person, or by any such minor under the age of fourteen years: PROVIDED FURTHER, That this exclusion shall not apply to parties of record who sue or defend in a representative or fiduciary capacity, and have no other or further interest in the action.

RCW 5.60.030.

■■■ ¶22 The purpose of the statute is to prevent interested parties from giving self-serving testimony regarding conversations and transactions with the deceased because the dead cannot respond to unfavorable testimony. *In re Estate of Cordero*, 127 Wn. App. 783, 789, 113 P.3d 16 (2005). The test to determine whether the testimony concerns a transaction covered by the statute is whether the deceased, if living, could contradict the witness of his own knowledge. *Estate of Lennon v. Lennon*, 108 Wn. App. 167, 178, 29 P.3d 1258 (2001). This is not, however, to say that an interested party cannot testify at all. For instance, an interested party can testify as to her own acts. *See, e.g., Slavin v. Ackman*, 119 Wash. 48, 50-51, 204 P. 816 (1922). Likewise, an

interested party may testify as to her own feelings or impressions, so long as they do not concern a specific transaction or reveal a statement made by the decedent. *Jacobs v. Brock*, 73 Wn.2d 234, 237-38, 437 P.2d 920 (1968). Finally, documents are not barred. *Thor v. McDearmid*, 63 Wn. App. 193, 202, 817 P.2d 1380 (1991). Testimony regarding the intended meaning of those documents may, however, be prohibited. *See Wildman v. Taylor*, 46 Wn. App. 546, 550-51, 731 P.2d 541 (1987).

¶23 In addition to the facts described above, the trial court struck the following portions of Donna's amended declaration:

> Ken asked me to quit my job and fly to South Dakota to get married. It was not until after Ken proposed in September 2001 that I first learned that he wanted me to sign a prenuptial agreement before getting married.

> . . . Ken informed me that his long-time attorney, Mark Packer, suggested to him that we should meet with Ron Morgan to mediate the prenuptial agreement. . . . After mediation, Ken told me that I had to meet with my own attorney. . . .

> . . . .

> . . . Before signing the agreement, although I was generally aware that Ken was wealthy, I had no idea of the details of his businesses or his properties, including their nature (such as partnerships, corporations, etc.) or their values. Nor did I have any knowledge of his debts. At all times prior to signing the final prenuptial agreement, I was unaware of the full nature and extent of Ken's worth. He just told me we would get married in Deadwood, SD [South Dakota], and that I wasn't allowed to tell anyone we were getting married or that we had a prenuptial agreement. . . . Ken determined when we would get married and it seemed he was in a rush to get married as soon as possible. I still do not know why.

> . . . I was never provided with any financial statement showing Ken's assets and liabilities before signing the prenuptial agreement. It wasn't until 2005 that I learned that in December 2001, Ken had assets of approximately $93,000,000, approximately $16,000,000 in liabilities, and approximately $77,000,000 in equity.

¶24 Donna argues that either the trial court erred in striking these portions of her declaration or the Estate waived its protections by asserting that full disclosure of Ken's assets was made. We review evidentiary decisions made in conjunction with an order on summary judgment de novo. *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998).

A. Own Acts Exception and Documents Exception

¶25 Donna first argues that she "can testify as to her own acts and what she did and why she did it when the prenuptial agreement was signed." What she did and why she did it, however, is directly related to transactions with Ken. For instance, the trial court struck Donna's statements that "Ken asked me to quit my job and fly to South Dakota to get married," "Ken informed me that . . . we should meet with Ron Morgan to mediate the prenuptial agreement," and "he just told me we would get married in Deadwood, SD, and that I wasn't allowed to tell anyone." These are not mere recitations of Donna's acts. Rather, they are statements of what Ken said, and Ken could rebut them if he were alive.

¶26 Donna also argues that she can testify she did not receive financial information, because not receiving information was her own act and documents are not barred by the dead man's statute. Donna claims that if it is permissible to testify regarding a document that was actually received, then it is also permissible to testify about a document that was not received. Her argument is flawed. She relies on *Slavin*, in which the deceased's daughter was allowed to testify about her own actions after receiving a letter from her mother. 119 Wash. at 51. *Slavin* involved a letter that was in evidence and spoke for itself. *Id*. at 49. The deceased could not have rebutted the letter's existence. The absence of a document is a fundamentally different issue, because the deceased could assert that he did provide the information. Ken could have rebutted the assertion that she

did not receive the financial information if untrue. Further, in an analogous case where there was an issue regarding whether a deed was delivered, an interested party was prohibited from testifying that the deed was not delivered. *Martin v. Shaen*, 26 Wn.2d 346, 349-51, 173 P.2d 968 (1946).

## B. Own Impressions Exception

¶27 Donna asserts that some of the stricken portions of her declaration were merely her own impressions. The dead man's statute does not prohibit an interested party from testifying about her own impressions, because the deceased could not rebut the witness's personal beliefs. *Jacobs*, 73 Wn.2d at 237-38. From this, Donna argues that she was permitted to testify about her "impressions and feelings surrounding the signing of the prenuptial agreement, including the short time frame and pressure to get the agreement signed before the wedding." Had Donna's declaration included a generic statement that she felt pressured to sign the agreement, this may be a closer issue. But, there is no such statement in her declaration. Rather, the stricken portions of her declaration include Ken's specific statements that apparently led to the pressure Donna felt. For instance, she stated that "Ken asked me to quit my job and fly to South Dakota," and "Ken determined when we would get married and it seemed he was in a rush to get married as soon as possible." These are statements about transactions with Ken, not statements regarding her own impressions.

## C. Waiver

¶28 The protections of the dead man's statute may be waived by failure to object, cross-examination that is not within the scope of direct examination, or testimony favorable to the estate about transactions or communications with the decedent. *Thor*, 63 Wn. App. at 202. In response to the Estate's motion to strike portions of Donna's declaration for violating the dead man's statute, Donna asserted

that the Estate waived its protections under the dead man's statute by asserting that Ken had made financial disclosure. On appeal, she reiterates the same argument.

■ ¶29 In order to establish procedural fairness the Estate must prove that there was financial disclosure. *Friedlander v. Friedlander*, 80 Wn.2d 293, 302, 494 P.2d 208 (1972). Based on that requirement, under Donna's argument an estate necessarily waives the protections of the dead man's statute in every case in which procedural fairness is at issue. But, it is possible to establish disclosure without relying on evidence that waives the statute. For instance, the introduction of documentary evidence does not waive the Estate's protections. *See, e.g., Erickson v. Robert F. Kerr, M.D. PS*, 125 Wn.2d 183, 188-89, 883 P.2d 313 (1994). The Estate was entitled to rely on documents such as the prenuptial agreement, which included Donna's initialed representation that full disclosure was made, to establish that there was disclosure. The Estate did not automatically waive its protections by doing so. The trial court correctly rejected that argument and properly struck offending portions of Donna's declaration.

¶30 Donna raises a different theory of waiver in her reply brief. She claims that the Estate waived the dead man's statute by attaching evidence of Donna's transactions with Ken to its motions for summary judgment, which were heard at the same time as its motion to strike and Donna's motion for summary judgment. Specifically, the Estate attached her testimony before the Gaming Commission, testimony from her depositions, and testimony from Morgan's deposition. The Estate argues that it did not waive the statute, because all the evidence Donna cites can be sorted into four permissible categories: (1) testimony that was not actually offered or relied upon, (2) testimony that was offered only in the context of explaining what testimony should be struck under the dead man's statute, (3) testimony about matters that are not transactions between Donna and Ken, or (4) testimony about transac-

tions between Donna and Ken that did not concern disclosure of Ken's statements and actions leading up to the wedding.

¶31 But, the only basis for waiver Donna raised below was whether the Estate necessarily waived the statute by asserting that there was disclosure. She did not raise the theory that the Estate waived the statute by attaching specific excerpts of testimony to its motions when they were heard.[2] After the Estate's motions were heard, Donna did not file a motion for reconsideration of the prior ruling on that basis. On appeal, she did not assign error to the trial court's failure to find error on that basis and did not articulate the argument until her reply brief. Because she did not raise her argument below, the trial court did not rule on it and the issue is not properly before us. We will not consider it for the first time on appeal. RAP 2.5(a); *Brundridge v. Fluor Fed. Servs., Inc.*, 164 Wn.2d 432, 441, 191 P.3d 879 (2008).

## II. Judicial Estoppel and Ratification

¶32 The trial court granted the Estate's motion for partial summary judgment regarding estoppel and ratification, determining that "based on Petitioner Donna M. Kellar['s] submissions and sworn testimony to the South Dakota Commission on Gaming in December 2005, she is estopped from arguing that the prenuptial agreement she entered into with Kenneth L. Kellar on September 14, 2001 is invalid." Because the trial court did not specify whether the decision was based on judicial estoppel or ratification, we consider both theories.

### A. Judicial Estoppel

¶33 Judicial estoppel is an equitable doctrine that precludes a party from asserting one position in a court

---

[2] Donna does not claim on appeal that she raised this argument below, and it is apparent that she did not raise it in her briefs in opposition to the Estate's motion to strike, motion for summary judgment on procedural fairness, or motion for summary judgment on judicial estoppel and ratification.

proceeding and later seeking an advantage by taking a clearly inconsistent position.[3] *Arkison v. Ethan Allen, Inc.*, 160 Wn.2d 535, 538, 160 P.3d 13 (2007). The purpose of the rule is to protect the integrity of the judicial process. *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001). In determining whether the doctrine applies, we look at three primary considerations: (1) whether a party's later position is clearly inconsistent with its earlier position, (2) whether judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled, and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *Arkison*, 160 Wn.2d at 538-39. These factors are not an exhaustive formula and additional considerations may guide a court's decision. *Id.* at 539. These include:

> (1) The inconsistent position first asserted must have been successfully maintained; (2) a judgment must have been rendered; (3) the positions must be clearly inconsistent; (4) the parties and questions must be the same; (5) the party claiming estoppel must have been misled and have changed his position; (6) it must appear unjust to one party to permit the other to change.

*Markley v. Markley*, 31 Wn.2d 605, 614-15, 198 P.2d 486 (1948); *see also Arkison*, 160 Wn.2d at 539. We review a trial court's decision to apply the equitable doctrine of judicial estoppel for abuse of discretion. *Arkison*, 160 Wn.2d at 538.

▮▮▮▮ ¶34 Because judicial estoppel does not apply unless there are two judicial proceedings, Donna argues that the Gaming Commission is an administrative, rather than judicial, body. But, some jurisdictions have recognized that judicial estoppel applies equally to proceedings before an administrative body sitting in a quasi-judicial capacity. *See,*

---

[3] The Washington Supreme Court recently held judicial estoppel applies to both questions of fact and questions of law. *Anfinson v. FedEx Ground Package Sys., Inc.*, 174 Wn.2d 851, 865-66, 281 P.3d 289 (2012).

*e.g., White Tiger Graphics, Inc. v. Clemons*, 88 So. 3d 908, 911 (Ala. 2012); *People v. Voit*, 200 Cal. App. 4th 1353, 1371, 133 Cal. Rptr. 3d 431 (2011); *Maniez v. Citibank, FSB*, 404 Ill. App. 3d 941, 948-49, 937 N.E.2d 237, 344 Ill. Dec. 531 (2010). Quasi-judicial proceedings include an agency's official adjudicative acts and are subject to review by the judiciary. BLACK'S LAW DICTIONARY 1364 (9th ed. 2009). In Washington, adjudicative proceedings include proceedings before an agency in which an opportunity for the hearing is required by statute or constitution, and also in all cases concerning licensing and rate making. RCW 34.05.010(1). Thus, licensing decisions made by the Washington State Gambling Commission are quasi-judicial adjudicative proceedings subject to judicial review. RCW 9.46.095; RCW 34.05.570. The Estate has not, however, cited any Washington authority which has previously applied judicial estoppel to a position taken in an earlier quasi-judicial proceeding. Further, the Estate has not briefed South Dakota law and has not established that the Gaming Commission was acting in a quasi-judicial capacity under South Dakota law. We hold that judicial estoppel does not apply absent a prior judicial proceeding in which the alleged inconsistent position was taken.

¶35 But, we also determine that the position Donna took in the licensing proceeding is not clearly inconsistent with her position here. The positions taken must be diametrically opposed to one another. *See, e.g., Seattle-First Nat'l Bank v. Marshall*, 31 Wn. App. 339, 343-44, 641 P.2d 1194 (1982). The parties to the proceeding were Donna and the Gaming Commission. Ken and Donna were not adversaries. Rather, she applied for the licenses at his urging. He was implicitly aligned with her position that she was entitled to the licenses. The ultimate issue was whether Donna kept her assets sufficiently separate from Ken's assets such that Ken would not financially benefit if Donna's application for licenses was granted. Donna and Pluimer stated that Donna was party to a prenuptial

agreement that restricted the creation of community property, that Donna had in fact kept their assets separate, and that she intended to keep their assets separate. The prenuptial agreement, which was admitted and spoke for itself, was merely evidence that she satisfied the requirements to obtain a license.

¶36 The Gaming Commission stated in its ruling that the prenuptial agreement was valid and undoubtedly relied on that conclusion when issuing the licenses. But, the Gaming Commission had no authority to actually adjudicate the validity of the prenuptial agreement as between Ken and Donna. It could only determine what action it would take based on the existence of the document. The Gaming Commission was a third party evaluating whether it would rely on the prenuptial agreement of the marital community when conducting its business, not a court adjudicating the validity of that agreement. The trial court here was not concerned with the question of whether Donna was eligible for a gaming license or whether the Gaming Commission properly relied on the prenuptial agreement or Donna's testimony in issuing the licenses. The issue here is whether the prenuptial agreement is void and unenforceable from its inception. This is a matter for the judiciary alone. The one court involved here, the Washington Superior Court, will not be misled by virtue of the position taken at the Gaming Commission.[4]

¶37 Finally, the Estate has not shown that accepting Donna's current position would allow her to obtain an unfair advantage or impose an unfair detriment on the

---

[4] We need not be concerned with whether the Gaming Commission was misled since judicial estoppel is concerned with the integrity of the courts. When a prenuptial agreement is set aside or a marriage declared invalid nunc pro tunc anyone who relied on the existence of the agreement or the marriage may in retrospect believe they were misled or in fact have been misled. However, whatever claims these third parties have against the parties to the marriage, those claims are not a basis to refuse the exercise of the right of the parties to the marriage to challenge the agreement or the marriage itself.

Estate.[5] The Estate first argues that Donna benefited by obtaining licenses from perjured or disavowed testimony. Ken urged Donna to obtain the licenses so he would have more of them under his control. Implicitly, he saw a benefit to himself, not just her. If the prenuptial agreement were set aside, those licenses and the benefits would become part of the marital estate to be divided. The Estate has not shown that the receipt of the licenses was an unfair advantage to Donna. Second, the Estate contends that Donna would benefit by obtaining gifts in Ken's will that he made based on a presumption that the prenuptial agreement was valid. That argument is purely speculative. Even if the statement were factually supported, the Estate's argument is totally detached from the licensing proceeding. Any unfairness to Ken would flow from Donna's successfully demonstrating that the prenuptial agreement is invalid from the inception, not from Ken's reliance on Donna's position before the Gaming Commission or any other time during their marriage.

¶38 The trial court abused its discretion to the extent it determined that judicial estoppel precludes Donna from arguing that the prenuptial agreement is invalid.

## B. Ratification

¶39 The Estate also argues that at the latest Donna had financial disclosure prior to her testimony before the Gaming Commission, and that she therefore ratified the prenuptial agreement by testifying to its existence and terms and her conformity to its existence and terms.

---

[5] Donna argued below that an affidavit from Pluimer constituted new evidence that justified reconsideration. She claims the affidavit shows that Donna was merely a tool to be used by Ken to obtain additional gaming licenses and that the licenses were for the sole benefit of Ken. The affidavit could have been used to show that the Gaming Commission's decision was to Ken's, as opposed to Donna's, benefit. Because the trial court erred by dismissing on the basis of judicial estoppel, we need not consider her argument. We note, however, that it appears the affidavit was filed in an ancillary proceeding to which Donna was a party. The affidavit was not a newly discovered document that could not have been discovered and produced by Donna. CR 59. It did not justify reconsideration. CR 59.

¶40 A party ratifies an otherwise voidable contract if, after discovering facts that warrant rescission, the party remains silent or continues to accept the contract's benefits. *Ebel v. Fairwood Park II Homeowners' Ass'n*, 136 Wn. App. 787, 793-94, 150 P.3d 1163 (2007). But, a contract that is void at its inception, as opposed to merely voidable, is an absolute nullity and is incapable of ratification. *See, e.g., In re Estate of Romano*, 40 Wn.2d 796, 803, 246 P.2d 501 (1952).

¶41 Prenuptial agreements are contracts subject to contract law but also subject to special rules formulated by the legislature and the courts. *In re Marriage of Burke*, 96 Wn. App. 474, 477, 980 P.2d 265 (1999). The parties to a prenuptial agreement are unique, because they do not deal with each other at arm's length. *Friedlander*, 80 Wn.2d at 301. Their relationship is one of mutual confidence and trust, which calls for the exercise of good faith, candor, and sincerity in all matters bearing upon the proposed agreement. *Id.* The validity of a prenuptial agreement is based on the circumstances surrounding the execution of the agreement. *In re Marriage of Bernard*, 165 Wn.2d 895, 904, 204 P.3d 907 (2009).

¶42 Washington courts have not considered whether the doctrine of ratification can be applied to prenuptial agreements. But, the Washington Supreme Court has held that the passing of time during a marriage cannot support a laches defense to a postdeath challenge to a prenuptial agreement. *In re Estate of Crawford*, 107 Wn.2d 493, 501, 730 P.2d 675 (1986). It reasoned that an "economically subservient spouse could not be expected to challenge the dominant spouse during his lifetime." *Id.* (citing *In re Estate of Flannery*, 315 Pa. 576, 173 A. 303 (1934)). To say that acting in conformance with or in reliance on the prenuptial agreement rather than challenging it amounts to ratification would accomplish what the parties in those cases sought through their laches argument. It is untenable. Indeed, the New Hampshire Supreme Court adopted the same rule

precluding ratification, reasoning that considering a wife's delay in challenging a prenuptial agreement as evidence of ratification would penalize the wife for choosing not to disrupt her marriage. *In re Estate of Hollett*, 150 N.H. 39, 44-45, 834 A.2d 348 (2003).

¶43 We rely on the reasoning in *Flannery*, *Crawford*, and *Hollett* in holding that a prenuptial agreement that is substantively and procedurally unfair is void from the inception and is incapable of ratification. The trial court erred to the extent it granted summary judgment on the basis that Donna had ratified the prenuptial agreement.

## III. Fairness

¶44 A prenuptial agreement is substantively fair if it provides a fair and reasonable provision for the party not seeking enforcement of the agreement. *In re Marriage of Matson*, 107 Wn.2d 479, 482, 730 P.2d 668 (1986). If it is substantively fair, the inquiry ends. *Id*. If it is substantively unfair, then the court considers whether it is nevertheless procedurally fair. *Id*. at 482-83. To determine whether a prenuptial agreement is procedurally fair, we consider (1) whether there was full disclosure by the parties of the amount, character, and value of the property and (2) whether the agreement was entered into freely and voluntarily, upon independent advice, and with full knowledge by both spouses of their rights. *Id*. at 483. Thus, a prenuptial agreement is valid if it is either substantively fair or procedurally fair. The party seeking to enforce the agreement has the burden of proving its validity. *Crawford*, 107 Wn.2d at 496.

¶45 Donna appeals the denial of her motion for summary judgment, alleging that the agreement is both substantively and procedurally unfair. With regard to procedural fairness, she argues that there was not full financial disclosure, that there was insufficient time to allow her to

freely and voluntarily enter the agreement, and that she received ineffective assistance of counsel. The Estate cross appeals the denial of its motion for summary judgment, alleging that the agreement is procedurally fair and therefore valid. Because we determine that the agreement is procedurally fair, we need not consider whether it is substantively unfair.

A. Disclosure

¶46 The prenuptial agreement itself included an initialed representation and warranty that there was full financial disclosure. Thus, there is strong evidence that disclosure was made. In contrast, Donna's statements that there was no disclosure were properly stricken pursuant to the dead man's statute. There is no remaining direct evidence that disclosure was not made. Rather, Donna relies on statements from her attorney and the mediator that they could not recall seeing a list. She also argues that because Ken's attorney recommended that the prenuptial agreement explicitly list assets, the fact that the agreement did not explicitly do so suggests that no disclosure was made. These statements are insufficient to raise a genuine issue of material fact regarding disclosure.

B. Timing

¶47 Donna claims that the negotiation process was "wholly inequitable and per se fatal to the agreement," because of the short period of time that passed between the date of the proposal, the date the prenuptial agreement was signed, and the date of the wedding. Specifically, she asserts that she and Ken married 17 days after Ken's proposal, 13 days after the mediation, 8 days after Donna first saw the prenuptial agreement, and 5 days after she signed the prenuptial agreement. But, issues of timing are relevant only to the extent they inform whether the agreement was entered into freely and voluntarily, upon independent advice, and with full knowledge by both spouses of their rights. There is nothing inherently fatal about signing a prenuptial agreement 5 days before the wedding.

¶48 Donna relies on cases in which the shortness of time was a factor in setting aside the prenuptial agreement. In *Bernard*, the challenging spouse's attorney testified that he did not have sufficient time to conduct a full review of the agreement or draft a counteragreement. 165 Wn.2d at 899. In *In re of Marriage of Foran*, a spouse established that she was under a great deal of pressure and did not have time to actually obtain her own counsel. 67 Wn. App. 242, 246, 834 P.2d 1081 (1992). In *Crawford*, a spouse did not have an opportunity to seek independent counsel because she saw the agreement for the first time three days before the scheduled wedding and signed it that day. 107 Wn.2d at 497-98.

¶49 Those cases are readily distinguishable. Donna obtained independent counsel. Her attorney actually communicated with Ken's attorney and negotiated a revision in the prenuptial agreement. Her attorney did not testify that he needed more time to review the agreement. And, Donna testified that when she left for South Dakota she was unsure if she and Ken would get married. She never suggested that the wedding was too soon. Her claim that she signed the agreement under pressure, because of the approaching wedding date, is not supported by the record.

## C. Ineffective Assistance

¶50 Donna claims that Peach did not provide effective legal counsel, and that prior to entering the agreement she did not understand her rights or the concept of separate and community property.[6] We reject her contention that the procedural fairness test requires "effective counsel."

---

[6] We note that the prenuptial agreement contained an independent counsel provision:

Both parties acknowledge that they have received the advice of independent counsel with regard to this Agreement. Both parties acknowledge that they have been advised of the entire estate of the other, that they have been advised of and understand their rights hereunder and of their marital rights and that after seeking such advice as they deem necessary, each have independently, freely and voluntarily signed this agreement.

¶51 In *Bernard*, the Court of Appeals determined that a prenuptial agreement was procedurally unfair because the challenging spouse's attorney was not party to the negotiations and the attorney did not accurately advise her of her rights. *In re Marriage of Bernard*, 137 Wn. App. 827, 835-36, 155 P.3d 171 (2007). The Washington Supreme Court explicitly declined to consider whether inadequate counsel can be a basis for finding a prenuptial agreement procedurally unfair and stated that the challenging spouse did not make that argument before the Court of Appeals or the Supreme Court. 165 Wn.2d at 907 n.8.

¶52 Donna relies on the Court of Appeals decision in *Bernard* for her argument Peach did not fully inform her of her rights, and that there is no representation by counsel when a spouse is merely advised by counsel and not fully represented during the negotiations. She also claims that Peach did not fully inform her of her legal rights.

¶53 First, we cannot say that effective independent counsel is required when independent counsel is not even required in all cases. *Matson*, 107 Wn.2d at 483. The Washington Supreme Court has stated that in some circumstances, a requirement for independent counsel would be arbitrary and unnecessary. *Id.* The precise standard should be applied on a case-by-case basis. *Id.* Likewise, counsel's presence at any mediation or negotiation is not a prerequisite to procedural fairness. Here, the parties to the prenuptial agreement decided to negotiate the terms of the agreement with a professional mediator without the presence of counsel. They negotiated further with the benefit of independent counsel and revised the agreement after the mediation. The fact that counsel was not present at the mediation is not a valid basis to find that the prenuptial agreement is procedurally unfair.

¶54 Second, Donna's proposed subjective test for effective assistance is untenable. The procedural fairness test directs us to consider " 'whether the agreement was entered into fully and voluntarily, upon independent advice and

with full knowledge by [both spouses of their] rights.' " *Id.* (alteration in original) (quoting *Whitney v. Seattle-First Nat'l Bank*, 90 Wn.2d 105, 110, 579 P.2d 937 (1978)). Accepting Donna's argument would require us to separately consider whether there was competent independent advice and whether there was full understanding of those legal rights. A prospective spouse could not have confidence that an agreement was valid without inquiring into, weighing, and evaluating the adequacy of the other spouse's independent counsel. To do so would eliminate the independence of that independent counsel and require an invasion of attorney-client privilege. In addition to evaluating the independent counsel's performance, the prospective spouse would have to inquire into the other spouse's actual understanding of the legal issues. Otherwise, in any subsequent challenge, the challenging spouse would only have to assert that her counsel failed to mention a legal right or that she lacked full understanding of her legal rights to defeat an assertion of procedural fairness.

¶55 Knowledge of one's legal rights is a conclusion that flows from the opportunity to obtain independent counsel. Donna had that opportunity in this case. She obtained independent counsel, she participated in a mediation in which counsel was not present for either side, and her attorney negotiated on her behalf for revisions after the mediation. It is not a requirement that she attain a lawyer's understanding of the nuances of family law. Our inquiry is not whether she failed to understand her rights or whether her counsel failed to adequately inform her. It is sufficient that she had adequate opportunity to consult independent legal counsel.

¶56 A spouse who receives ineffective assistance during prenuptial negotiations and is not made fully aware of her legal rights may have a claim against her attorney, but she does not have a basis to invalidate the prenuptial agreement itself. To the extent that our decision in *Bernard* conflicts with this conclusion, we decline to follow it.

¶57 Donna failed to raise a material question of fact regarding whether the necessary disclosure of assets was

made or whether she entered the prenuptial agreement freely and voluntarily, upon independent advice, and with full knowledge of her rights. The Estate met its burden to prove procedural fairness, and the trial court erred by denying the Estate's motion for summary judgment on that basis.

## IV. No-Contest Clause

¶58  The no-contest clause in Ken's will provided:

> If any person brings any action, lawsuit, or claim against my estate, my Personal Representative, or any other beneficiary under my Will, which requests a resolution that would, if successful, increase the share of the claimant of my estate, then I direct that the claimant shall forfeit all interest in my estate, and the share that such person would have received under my Will shall be distributed as if he or she had died before me, leaving no descendants.

¶59  No-contest provisions have been upheld by Washington courts, but their breadth depends on the specific provision's language. For instance, in *Boettcher v. Busse* a creditor's claim did not trigger a no-contest clause that stated that any challenger to the will would not take under the will. 45 Wn.2d 579, 585, 277 P.2d 368 (1954). The court reasoned that the creditor's claim was not a claim against the will. *Id*.

¶60  We have not been asked to consider whether such a clause violates public policy by chilling the right to challenge the prenuptial agreement as void. We are asked only whether such a challenge in this case triggered forfeiture. The clause in Ken's will does not limit itself to challenges to the will. Rather, it refers to any challenge that would increase the claimants share in Ken's estate. But, by challenging the prenuptial agreement, Donna challenges the validity of the inventory of property to be included in the estate. If she prevails, then certain property may be removed from the inventory and flow to her by statute as opposed to through the estate. Though her success could

decrease the size of the estate, it would not necessarily increase Donna's share of the estate.

¶61 The trial court correctly concluded that the challenge to the prenuptial agreement was not a challenge to the estate that triggered the forfeiture clause.

## V. Attorney Fees Below

¶62 Donna argues that the trial court abused its discretion both in awarding fees at all and in determining that the fees requested were reasonable. We review an attorney fee award for an abuse of discretion. *Emmerson v. Weilep*, 126 Wn. App. 930, 940, 110 P.3d 214 (2005).

¶63 After extensive briefing and oral argument, the trial court granted the Estate's motion for attorney fees and costs in the amount of $259,862. Referring to the will's no-contest clause, at oral argument the trial court stated that it could carry out Ken's intent "so long as no loss is realized to the estate, and that can be done in this case by the award of attorney fees expended by the estate in defending the prenuptial agreement." Donna claims it was improper to base attorney fees on the no-contest clause. The trial court's order granting attorney fees and its subsequent findings of fact and conclusions of law, however, do not justify the fees on that basis. Rather, the fees were based on a provision for fees in the prenuptial agreement itself, RCW 4.84.330, and RCW 11.96A.150(1). Donna has not argued that the findings are not supported by the facts of the case or that the findings do not support the conclusions of law.

¶64 The presiding judge further stated at oral argument that he thought he could have performed the work in approximately 120 hours and that 120 hours of work was reasonable. But, in his actual award he granted the Estate fees for 685 hours of work. Donna claims that this change of heart was per se an abuse of discretion. Again, however, Donna does not offer any challenge to the trial court's actual findings of fact and conclusions of law. She is not challenging individual time entries or billing rates used in

the lodestar calculation, only the gross award. She is not arguing the fees awarded were not based upon the prenuptial claims. Further, there was a second hearing on fees that occurred between the presiding judge's statement that 120 hours was reasonable and the actual order granting fees. At that second hearing, Donna's counsel reminded the judge of his previous statement. He shrugged it off, responding, "I was in practice a long time ago."

¶65 Donna has not shown that the trial court committed an abuse of discretion by awarding fees and finding that the Estate's fees were reasonable.

VI. Attorney Fees on Appeal

¶66 Donna requests fees on appeal pursuant to RAP 18.1, RCW 11.96A.150(1), and RCW 4.84.330. The Estate requests fees pursuant to RAP 18.1, RCW 11.96A.150(1), and the attorney fee provision in the prenuptial agreement.[7] We award Donna fees on appeal solely on the issue of Estate's cross appeal of the will no-contest clause. We award the Estate its reasonable fees and costs on the remaining issues.

¶67 We affirm in part and reverse in part.

SPEARMAN, A.C.J., and SCHINDLER, J., concur.

Reconsideration denied January 31, 2013.

Review denied at 178 Wn.2d 1025 (2013).

---

[7] The Estate did not include a request for fees in its opening brief but filed a motion for leave to correct its brief by adding a request for attorney fees. The motion is granted.