# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION  II

| | |
|---|---|
| ESTATE OF RICHARD CASTLE, | No.  60002-1-II |
| Respondent, | |
| v. | |
| PAUL E. GRAVES and PATRICIA HATFIELD GRAVES, and any other occupants, occupying the property located at 900 SE State Route 3, Shelton, Washington, | UNPUBLISHED OPINION |
| Appellants, | |
| KAREN CASTLE SMITH, in her capacity as Personal Representative of the ESTATE OF RICHARD CASTLE, | |
| Respondent. | |

LEE, J. — Paul and Patricia Graves (collectively "the Graves") appeal a judgment against them following a bench trial in an ejectment action brought by the Estate of Richard Castle (the Estate).  The Graves argue that the trial court erred in excluding the Graves' testimony about their transaction with the decedent, Castle, because the Estate had waived the "Deadman's Statute."  In addition, the Graves challenge many of the trial court's findings of fact and conclusions of law. The Graves also argue that the trial court failed to address, or in the alternative erred in rejecting, the Graves' quasi contract claim; the trial court erred by finding a landlord-tenant relationship; and the trial court erred by rejecting the Graves' adverse possession claim.

We affirm.

FACTS

A.    BACKGROUND[1]

In May 2000, Paul[2] purchased a residence in Shelton, Washington for $163,000.  In 2005, Paul transferred the property to himself and his wife, Patricia, after which the Graves refinanced the property.

In 2006, the Internal Revenue Service recorded a tax lien against the Graves.

Paul, who worked in the timber industry, experienced financial difficulties in 2007 and 2008 when the timber industry "all but stopped."  Clerk's Papers (CP) at 777.  In 2008, Paul attempted to again refinance the property and obtained a good faith estimate outlining the costs of a loan.  The record does not show that the 2008 attempt to refinance was completed.

In July 2009, the Graves experienced financial distress and conveyed the property to Castle. Castle purchased the property with a $200,000 bank loan recorded against the property and $50,000 of his own money.  Castle also paid $9,142.56 in closing costs.  In addition, Castle paid the Graves over $12,000 to cover the sellers' closing costs at the time of the property transfer.

After Castle obtained title to the property, the Graves continued living on the property and periodically paid Castle.  Castle reported the property as a rental and the payments received from

---

[1] The facts in the Background section are not disputed by the parties or are derived from the unchallenged findings of fact, which are considered verities on appeal.  *Alexandria Real Est. Equities Inc., v. Univ. of Wash.*, 28 Wn. App. 2d 944, 961, 539 P.3d 54 (2023), *review denied*, 2 Wn.3d 1031 (2024).

[2] Because Paul and Patricia Graves share the same last name, we refer to each by their first names for clarity where necessary.  We intend no disrespect.

the Graves as rental income on his federal tax returns and in loan applications, sometimes specifically identifying the Graves as tenants.

Castle died in February 2021. Castle named his daughter, Karen Castle-Smith, the personal representative of his Estate. The Estate continued to pay the mortgage after Castle's passing, while the Graves continued living on the property and periodically paid the Estate as they did during Castle's life. Later, the Estate notified the Graves that it intended to sell the property and demanded that the Graves vacate the property. The Graves refused to vacate the property.

In June 2021, the Estate filed an ejectment action against the Graves, and the Graves asserted affirmative defenses and counterclaims based on alternative theories of oral contract/gift, implied contract at law or quasi contract, adverse possession, and equitable and promissory estoppel.

B. TRIAL

A bench trial took place in July and August 2024. At trial, the Estate rested its case after the trial court admitted 55 exhibits offered by the Estate without testimony.[3] The Graves then presented testimony from several witnesses familiar with the transaction between Castle and the Graves.

1. Castle-Smith's Testimony

The Graves called Castle-Smith to testify as the personal representative of her father's estate. On direct examination, the Graves inquired into Castle-Smith's understanding of the Graves' use of the property:

---

[3] The appellate record does not include any trial exhibits.

[GRAVES' COUNSEL:] Do you know why the Graves are on the property, this property that we're litigating about?

[CASTLE-SMITH:] Why are they on the property?

[GRAVES' COUNSEL:] Uh-hum. Why are they there?

[CASTLE-SMITH:] Because they're renters.

[GRAVES' COUNSEL:] Okay. What evidence do you have that they're renters?

[CASTLE-SMITH:] Numerous checks that [the Graves] provided to my father at the time of his—when he was still alive. All of the stubs say either rent or lease.

. . . .

[GRAVES' COUNSEL:] Okay. Any other reason why you think they were renters?

[CASTLE-SMITH:] Because they're not the owners of the home and they reside there, and people who—my numerous papers of my father's said rent. His handwritten notations, he wrote rent.

. . . .

[GRAVES' COUNSEL:] Other than—so, other than the notations on the check stubs and . . . that they've paid fifteen hundred a month sometimes, what other evidence do you have that . . . the Graves were renting the property?

[CASTLE-SMITH:] His income tax returns say rent. His rental logs say rent. He told me he had tenants in the house. A tenant infers a rental. He had a landlord [insurance] policy.

. . . .

[GRAVES' COUNSEL:] . . . I believe your testimony was that, specific to this property [Castle] said he had tenants; is that right?

[CASTLE-SMITH:] That is correct.

[GRAVES' COUNSEL:] Okay. Did he tell you who the tenants were?

4

[CASTLE-SMITH:] I knew who the tenants were.

[GRAVES' COUNSEL:] Okay. He didn't tell you who they were?

[CASTLE-SMITH:] He did not tell me who they were.

1 Verbatim Rep. of Proc. (VRP) (July 30, 2024) at 56-70.

Castle-Smith also discussed a series of documents, including payment ledgers and a document Castle-Smith created to verify payments, and she identified her father's handwriting and her own notations. For example, Castle-Smith explained that she wrote "late payment" based on her assumptions of when payments were typically due or when other documents acknowledged that a payment was late. 1 VRP (July 30, 2024) at 81. Castle-Smith continued to clarify that she was not aware of the terms of any agreement between Castle and the Graves beyond the documents that the trial court had admitted. The Graves also questioned Castle-Smith about her knowledge surrounding a transaction involving a non-party, Maria Guzman.

On cross-examination, the Estate asked Castle-Smith about a document that Castle-Smith created to track payments the Graves made to Castle and the payments Castle made to the mortgage company. The document was titled "Richard Castle's financial investment in Shelton property." 1 VRP (July 30, 2024) at 106. Castle-Smith explained that the document showed payments that her father made in the debit column (loan payments and/or payments that he made in investments of the property,) and the credit column "reflect[ed] monies that [her] father received from the Graves for rent." 1 VRP (July 30, 2024) at 107. Castle-Smith created those entries based on bank statements, canceled checks, and Castle's notes.

The Estate also directed Castle-Smith to another exhibit, which was the same document with some "commentary," in which Castle-Smith wrote about what the mortgage balance would

have been if Castle only made minimum payments and how she "tried to figure that out." 1 VRP (July 30, 2024) at 109.

Castle-Smith further testified about one of her father's notebooks, in which he kept track of rentals for a given year. Castle-Smith also testified about two other tenants whose rentals Castle tracked in that notebook. And she testified that Castle recorded information in the notebook about the Graves' property, including dates, check numbers, and amounts.

2. Paul Graves' Testimony

Paul has lived in the house since 2000. Paul testified that he did not consider selling his house when he experienced financial challenges from 2008 to 2009. Paul explained that since the middle of 2009, title to the property was no longer in their names. Paul also testified that he never signed a rental agreement for the house.

In 2008, the Graves met with Howard Wheeler, a mortgage broker who also worked with Castle. The Graves inquired about refinancing their mortgage, and Wheeler performed a good faith estimate. However, the Graves did not proceed with a refinance because "[they] would get a better rate . . . if [they] went, you know, with Mr. Castle." 1 VRP (July 31, 2024) at 214. Paul explained that although they did not refinance through a conventional mortgage company, the Graves "ultimately enter[ed] into some type of refinance for [their] home." 1 VRP (July 31, 2024) at 215. Paul testified that the payments made after 2009 were for the refinance. Paul clarified that he has "never paid rent" and that he was "making a house payment." 1 VRP (July 31, 2024) at 216.

In 2011, the Graves again spoke to Wheeler about refinancing. However, the Graves chose not to refinance in 2011 because "it was determined that the interest rate would stay lower if [they]

didn't and [they] wouldn't have excessive closing costs to pay if [they] stayed with where [they] were at." 1 VRP (July 31, 2024) at 248. The good faith estimate reflected the cost of the loan, but it did not indicate any approval.

Discussing the payments Paul made to Castle, Paul clarified that he needed to pay a certain amount to stay in the house. Paul paid Castle once a month, and he made extra payments "when [he] could." 1 VRP (July 31, 2024) at 217. The payment amount varied for the first five years.

Paul also testified about improvements made to the property. The Graves completed projects on the property from 2000 through 2024. For example, after the Graves conveyed title to Castle, the Graves installed electronic and cattle gates, replaced windows, restored the floors, repaired the roof, and converted the stove from electric to gas. Paul created a document listing the improvements and modifications made on the property, based on "materials for the projects and the normal hourly rate that it would cost to have somebody do it." 1 VRP (July 31, 2024) at 224. Paul estimated the total cost to be $72,555. Paul did not use receipts to calculate the cost of materials, but he had personal knowledge of the cost of materials, and he tied some of the labor costs to his $90 hourly rates as a forestry consultant. For example, Paul received an estimate of around $18,000 for a roof replacement, but he estimated that it cost him $4,400 to do the work himself. Paul never asked for permission to do this work "because it was [his] house." 1 VRP (July 30, 2024) at 191.

During Paul's testimony, the Graves' counsel sought to elicit testimony surrounding Paul's characterization of his monthly payments to Castle. The Estate's counsel objected based on the Deadman's Statute. In response, the Graves' counsel argued that the Estate had waived the Deadman's Statute when Castle-Smith testified about several documents and explained that

various documents reflected rent payments. The Graves' counsel also argued that Castle-Smith testified that her father told her he had tenants and introduced evidence that there was a rental agreement such that the Graves should be allowed to rebut that evidence. The trial court ruled that the Estate did not waive the protections of the Deadman's Statute.

### 3. Patricia Hatfield-Graves' Testimony

Patricia testified that she knew Castle because he was her commercial landlord in Olympia from 2001 to 2021. She explained that she and Castle had developed a friendship and that Paul and Castle were best friends.

Regarding the property, Patricia testified that she never considered herself a tenant at the property, and no one had ever told her she was a tenant. She also explained that when the Graves wrote checks to Castle with "rent" or "lease" written on the check, they "didn't know what to call it, whether it was rent-to-own, lease-to-own," but she did not think the payments were rent payments. 1 VRP (July 31, 2024) at 286. Patricia also clarified that she never asked permission to make any changes to the property and that she has represented to third parties that she owned the home.

### 4. Mike Bell's Testimony

The Graves also called Mike Bell to testify. Bell is Castle's stepson and Castle-Smith's stepsibling. Bell testified that he believed the Graves owned the property because Castle told him that he was helping the Graves with the house, and Castle told Bell to make sure the Graves get their home.

8

5.      Maria Guzman's Testimony

The Graves also introduced testimony from Maria Guzman.  Guzman testified she and Castle "used to have a house . . . together. Kind of."  1 VRP (July 31, 2024) at 332.  Guzman explained that she had a written agreement with Castle.  Castle and Guzman entered into this agreement because "he said he c[ould] help" Guzman buy a house that was for sale.  1 VRP (July 31, 2024) at 333.  Guzman testified that when she first entered into this agreement with Castle, "[Castle] said [he was] doing the same thing for Paul."  1 VRP (July 31, 2024) at 341.

According to the agreement, once Guzman paid Castle $200,000 plus interest, she would have the house for $100.  Guzman paid Castle $3,000 a month for a year and a half.  Later, when she was experiencing financial difficulties, Castle accepted payments of $1,500, which they established through an oral agreement.

After Castle died, Guzman and Castle-Smith had a disagreement because Guzman was making reduced payments under her oral agreement with Castle, and Castle-Smith wanted around $320,000 from Guzman to purchase the house.

Guzman retained an attorney, and she "reached a compromise" with Castle-Smith to obtain title to the house.  1 VRP (July 31, 2024) at 340.

6.      Michael Wittenberg's Testimony

The Graves called Michael Wittenberg to testify.  Wittenberg was a CPA who worked with Castle for 15 to 20 years.  Wittenberg explained that he ended his professional relationship with Castle because Wittenberg no longer wanted the risk and complications related to how Castle conducted business.

9

Wittenberg testified that when Castle took title to the Shelton property, he told Wittenberg, "I want to make sure in the end these people get their house back. How do we do this?" 1 VRP (Aug. 1, 2024) at 366. Wittenberg explained that their solution was to "set up a rental relationship because [they] had to do something with the cashflow that the Graves were making . . . to [Castle] for that property" and that "it became a rental relationship, which is not really what it was, but that's what—how we set it up from a tax standpoint, to show the income and show the activity." 1 VRP (Aug. 1, 2024) at 366.

7.      Howard Wheeler's Testimony

The Graves also introduced testimony from Howard Wheeler, who worked with Castle to purchase the property. Wheeler explained that Paul wanted to refinance the home but lacked the credit to do so. He further testified that Castle "came up with the idea that he would—they would give him the house. They would refinance the note. [Castle] would take over and then in 2011, once Paul's credit was better, we would refinance back to Paul." 1 VRP (Aug. 1, 2024) at 391. Wheeler explained that there were "some drafts" of a written agreement between the Graves and Castle, but he did not believe anything was ever signed and completed. 1 VRP (Aug. 1, 2024) at 391.

Wheeler testified that the Graves were supposed to pay $1,500 a month and that their payment was to pay the mortgage. Wheeler also testified that the amount of payment "shouldn't have" varied. 1 VRP (Aug. 1, 2024) at 394. And Wheeler explained that Castle used the house "as a cross-collateralization" and "refinanced that house seven separate times and pulled cash out at each time." 1 VPR (Aug. 1, 2024) at 445, 446.

8.    Sabrina Avila's Testimony

Castle was a tax client of Sabrina Avila's. Castle came to Avila "looking for a second opinion" to see if he qualified for additional deductions. 1 VRP (Aug. 1, 2024) at 458. Avila testified that in those discussions, she learned about Castle's properties. She explained to Castle that "if [they] made [Castle] legit and made contracts for them [they] can add some more deductions." 1 VRP (Aug. 1, 2024) at 459. Avila explained that Castle needed to document his agreements with Guzman, the Graves, and at least two others.

Avila explained that she believed the transaction with the Graves was "like a rent-to-own, . . . they were making payments and he was carrying the note on it and they were making their monthly payments to own it." 1 VRP (Aug. 1, 2024) at 461. Avila also testified that she and Castle were in the process of formalizing the agreement when Castle got sick.

9.    Conclusion of Trial

During closing arguments, the Estate reiterated that its sole claim was ejectment. The Estate argued that it established that the Estate owned the property and that the Graves were in possession of the property and refused to leave.

In response, the Graves argued that there was a clear agreement between Castle and the Graves, the Graves made valuable improvements to the home, and the Graves contended that the Estate could not put forth any terms of a rental agreement to defeat the Graves' counterclaims and affirmative defenses.

C.    TRIAL COURT'S RULINGS

The trial court entered written findings of fact (FOFs) and conclusions of law (COLs). The FOFs stated, in relevant part:

11

2.1     The Graves sold the Property to Richard Castle in July 2009. [Exhibit 8] Mr. Castle was a good friend of Paul Graves and a landlord and friend of Patricia Graves.

2.1[sic] The sale of the Property to Mr. Castle was documented by escrow paperwork, a Real Estate Excise Tax Affidavit, and a Statutory Warranty Deed. [Exhibits 8, 9, 10, and 11]

2.2     The Statutory Warranty Deed the Graves executed to convey the Property to Mr. Castle does not indicate there are any encumbrances on title related to the Graves' alleged rights to acquire the Property in the future.  [Exhibit 8]

2.3     Mr. Castle purchased the Property for $250,000.  [Exhibit 9]

2.4     Mr. Castle's purchase funds consisted of a $200,000 bank loan, which was recorded against the Property, and $50,000 of his own money.  Mr. Castle additionally paid $9,142.56 in closing costs. [Exhibits 10, 12, and 13]

2.5     At closing, the Graves received $250,000 less their share of closing costs.  Out of the Graves' net sales proceeds, the Graves' bank loans recorded against the Property and Mr. Graves' IRS tax lien were paid.  The payoff of just the Graves' first mortgage alone was $178,073.19.  [Exhibits 11 and 14]

2.6     Mr. Castle additionally paid money to the Graves, which they used to cover the seller's share of closing costs at the time of transfer.  Mr. Castle's payment to the Graves of over $12,000.00 is evidenced by a cashier's check. [Exhibit 29]

2.7     After the Property was purchased by Mr. Castle in 2009, Mr. Castle insured the Property as an owner with a landlord protection policy.  [Exhibit 17, and also Exhibits 51, 52, and 53]

2.8     There was no wrongdoing related to Mr. Castle's acquisition of the Property.

2.9     The assessed value of the Property was $245,340 in 2020 according to public records.  The Graves had purchased the Property for $163,000 in 2000. There is no indication Mr. Castle's purchase of the Property for $250,000 (plus payment of over $20,000 in closing costs) in July 2009 was for less than fair market value.

CP at 778-79. The trial court entered the following FOFs related to the Graves' occupancy of the

property after Castle obtained title:

> 3.1 The Graves had lived on the Property since 2000, and they continued to live on the Property after they sold the Property to Mr. Castle.

> 3.2 There is no written agreement between Mr. Castle and the Graves concerning the Property. There is no written rental agreement, nor is there any written real estate contract obligating Mr. Castle to sell the Property to any particular person.

> 3.3 The Graves made payments to Mr. Castle totaling $6,850.00 in 2009. [Exhibit 23]

> 3.4 Mr. Castle identified the Property on his 2009 federal income tax return as a property he owned and used as a rental. Mr. Castle reported he received $6,850 in rent from the Property in 2009. [Exhibit 19]

> 3.5 After Mr. Castle purchased the Property in 2009 he consistently reported it on his tax returns as an income producing rental property that he owned. Mr. Castle also consistently insured the Property as the owner and insured it with a landlord policy. Mr. Castle consistently made mortgage payments against the loan he took out against the Property and through those mortgage payments Mr. Castle paid the property taxes. [Exhibits 17, 19, and 30-55]

CP at 779. In addition, the trial court made the following FOFs related to evidence of an

agreement:

> 4.2 Mr. and Mrs. Graves testified they believe the Property has always belonged to them. However, due to the Deadman's Statute they could not testify about details of their alleged transaction with Mr. Castle.

> 4.3 Mike Bell is Richard Castle's step-son. Mr. Bell testified that his dad told him on two separate occasions that he was helping the Graves and wanted the Graves to get their house back. He also testified that he never communicated this to anyone before he was made aware of the instant lawsuit. He could not provide any context to the alleged conversations. Mr. Bell testified he was not aware of any specific terms of an agreement. The Court does not find Mr. Bell's testimony credible.

13

4.4     Maria Guzman had a business relationship with Mr. Castle. Ms. Guzman testified Mr. Castle told her that he had an agreement with the Graves similar to an agreement Mr. Castle had with Ms. Guzman. However, Mr. Castle had a signed, written agreement with Ms. Guzman to allow Ms. Guzman to purchase a house for a specific price based on Ms. Guzman meeting a specific rent payment milestone. There is no written agreement with the Graves. Moreover, Ms. Guzman did not know if her rent payment milestone or ultimate purchase had anything to do with the mortgage amount on the house Ms. Guzman purchased from Mr. Castle. Ms. Guzman did not know any specific terms of an agreement with the Graves.

4.5     Ms. Guzman testified Mr. Castle had prepared a written agreement for her to sign to document his agreement with her. Given that she had a written agreement that stated terms, the Court finds that her testimony conflicts with the facts of her purchase making her testimony unpersuasive.

. . . .

4.7     There is an unsigned written agreement that appears to have been created in 2018. This document, if effective, indicates the Graves would have needed to vacate the Property at the end of the agreement term in 2020. This document indicates the Graves have an option to purchase the Property but does not state any price or essential terms. Given the testimony and documents admitted in the trial, it is most likely that the Graves and Mr. Castle did at some point discuss the sale of the property but did not arrive at an agreement.

4.8     Michael Wittenberg was Richard Castle's CPA from the 1990s until the mid-2010s. He testified Mr. Castle told him that his [Mr. Castle's] agreement with the Graves was to sell the Property back to the Graves. However, Mr. Wittenberg testified he believed Mr. Castle had intended for his transaction with the Graves to be a short-term deal, and that Mr. Castle wanted the Property titled in his name so that Mr. Castle could keep the Property if the Graves did not come through.

4.9     Mr. Wittenberg acknowledged that the tax returns he prepared identify Mr. Castle as the owner of the Property and the Property as a rental income producing Property. Mr. Wittenberg acknowledged that nothing in the tax returns suggests an agreement to convey the Property to the Graves. Mr. Wittenberg testified that he believed recognizing the Graves' payments as rent was his only option, but that he did not understand the Graves to be just tenants.

4.10     Mr. Wittenberg testified he did not know any details of specific agreement terms. For example, he did not know how much money the Graves were

ultimately supposed to pay Mr. Castle to get the Property back. Mr. Wittenberg testified it was impossible to know the parameters of the agreement between Mr. Castle and the Graves.

4.11    Howard Wheeler testified that Richard Castle was his client for mortgage services. Mr. Wheeler testified he was involved in the transaction between Mr. Castle and the Graves. Mr. Wheeler testified he understood the Graves would eventually get the Property back from Mr. Castle. However, Mr. Wheeler testified that at the time the agreement was made he did not know any terms of the agreement.

4.12    Mr. Wheeler testified that he believed the agreement was for the Graves to pay $1,500 per month. However, documentary evidence shows the Graves never paid $1,500 per month until mid-2017. [See, e.g. Exhibit 54]. Mr. Wheeler also testified that he believed it was intended to be a short-term transaction when Mr. Castle purchased the Property in 2009.

4.13    Mrs. Graves testified that the Graves applied for a loan in 2011 and were approved. She testified the approval paperwork was at home, but she did not know if she should bring it to Court. Mr. Wheeler also testified the Graves were approved for a loan in 2011, but he also did not have the documentation of any approval with him in Court.

4.14    Mr. Wheeler's testimony indicated the Graves were ready, willing, and able to perform on what was supposed to be a short-term deal by buying the Property back from Mr. Castle in 2011. However, Mr. Wheeler testified that Mr. Castle talked the Graves out of buying the Property back at that time. Mr. Wheeler testified Mr. Castle wanted to keep the Property so that Mr. Castle could use it as leverage to finance other deals. Underlying Mr. Wheeler's testimony is the obvious undercurrent and conclusion that the repeated leveraging of the property indicated that there was no agreement with the Graves. The Court does not find that Mr. Wheeler's testimony that Mr. Castle talked the Graves out of refinancing the Property to be credible given the Graves' financial situation.

. . . .

4.16    On May 31, 2011, the mortgage in Mr. Castle's name secured by the Property had a principal balance of $189, 592.96. [Exhibit 32]

4.17    Not only is there no documentation before the Court of the Graves being approved for financing in 2011, but also there is no documentation of any loan application or other evidence of the Graves' financial position in 2011. For example, the Graves did not submit their tax returns showing their income or any

15

other documentation to support their claim they could have purchased the Property from Mr. Castle in 2011, or that they could have purchased any other property.

4.18    The Graves admit they were in financial distress when they conveyed the Property to Mr. Castle in July 2009. Mr. Wheeler testified the Graves were in financial distress when they conveyed their interests of a property in Cowlitz County to Mr. Castle.  It was May 20, 2011 when the Graves signed a quitclaim deed indicating a conveyance of whatever interests the Graves may have had to Mr. Castle for property in Cowlitz County.

. . . .

4.20    The Graves only made seven rent payments to Mr. Castle in 2011, and the amounts were only $1,000 each.  Meanwhile, in 2011 Mr. Castle consistently made $1,650 payments per month toward the mortgage in his name secured by the Shelton residence. [Exhibits 23 and 54]

. . . .

4.25    The Court finds that the evidence, or lack thereof, shows the Graves did not have the financial ability to purchase a house, or refinance Mr. Castle's mortgage, at any time after they conveyed the property to Mr. Castle in July 2009.

4.26    It is incredible that if the Graves had documentation of their ability to secure financing they would not have presented such documentation to the Court at trial.   The existence of such documentation is unlikely based on the documentation that was submitted and admitted as evidence in this case.

4.27    To the extent there was any short-term agreement between the Graves and Mr. Castle, the Graves breached such agreement because they were unable to buy the Property back from Mr. Castle.

4.28    Moreover, there is speculation that Mr. Castle may have intended a gift to the Graves of the over $70,000 Mr. Castle paid at closing in July 2009.  There was no evidence about whether or how the Graves would pay Mr. Castle back in full for his purchase if indeed there were an agreement for Mr. Castle to convey the Property back to the Graves.  But whether Mr. Castle intended a gift is purely speculative.

4.29    The Court does not find there is evidence Mr. Castle intended to make a gift to the Graves and lose money on the transaction.

4.30     The Court finds there is no credible evidence of a purchase price for any agreement between Mr. Castle and the Graves.

4.31     The Court finds there is no evidence of a specific term (i.e. length of time) for any agreement between Mr. Castle and the Graves.

4.32     The Court finds there is no evidence of consideration for an agreement that would require Mr. Castle to convey the Property back to the Graves.

4.33     The Court finds there is no evidence of any other specific terms of an agreement, including default terms or insurance terms.

CP at 780-84.  The trial court then entered the following FOFs related to Castle's use of the property as a rental property:

5.1     Mr. Castle made over $200,000 in mortgage payments on the Property during Mr. Castle's lifetime—this is in addition to the cash Mr. Castle paid for the Property at closing. [Exhibits 30-55]

. . . .

5.3     During the Graves' occupancy of the Property after they sold the Property to Mr. Castle, the Graves would periodically send checks to Mr. Castle. The Graves wrote in the memo line on several of their checks to Mr. Castle that the payments were for "rent" or "house lease."  [Exhibits 20 and 21]

5.4     The amount of money the Graves sent to Mr. Castle over the years for rent did not fully repay the amount of money Mr. Castle paid to purchase the Property and service the mortgage.  [See, e.g. Exhibits 54-55]

5.5     The current balance of the mortgage secured by the Property is over $100,000.

5.6     Mr. Castle also identified the Property as a rental (and at times the Graves were specifically identified as tenants) in loan applications for other deals Mr. Castle was working on.  [Exhibits 18, 81, and 91]

5.7     Mr. Castle identified the Graves' payments to him as rent in written notes and in emails with Mr. Graves.  [Exhibits 20, 23, 25, and 27]

. . . .

17

5.14     If Mr. Castle's estate sells the Property, the Estate will receive the equity in the Property from the mortgage payments and appreciation in value due to the rising real estate market between 2009 and 2024. Further, Mr. Castle and his Estate will have benefitted from the rent payments received from the Graves in the past. This would be consistent with an owner/landlord's rights in residential real property.

5.15     If the Graves are forced to move out of the Property and find some other place to live, the Graves will not receive any equity from the Property and their past rent payments to Mr. Castle will have benefitted them by securing a place for them to live for the past fifteen years. This would be consistent with being a tenant.

5.16     If the Graves were awarded the Property subject only to paying off the existing mortgage, the Graves would receive the value of the Property's appreciation and would also benefit from a gift of the over $70,000 Mr. Castle paid at closing in July 2009. Meanwhile, the Estate would receive nothing and Mr. Castle would have lost money in the transaction.

5.17     The Court finds it would be inequitable to give tenants the value of real estate appreciation and a gift from their landlord.

5.18     The Court finds it is not inequitable, and is perfectly appropriate, for a landlord to use rent payments to pay the mortgage, sell a property, and receive the value of appreciation.

5.19     The Court finds the relationship between Mr. Castle and the Graves can be explained as a landlord-tenant relationship.

CP at 785-86. And the trial court entered FOFs related to the Graves' improvements to the property:

6.1     Mr. Graves testified he started improving the Property right after he purchased it in 2000, continued to make improvements after the Property was sold to Mr. Castle in 2009, and has continued to make improvements to this day even after the Estate asked the Graves to vacate.

6.2     The Graves did not ask permission to make improvements. For example, they did not ask Mr. Castle if they could improve the Property and they did not apply for permits.

18

6.3     There is no evidence Mr. Castle had any knowledge or appreciation of the improvements the Graves made to the Property.

6.4     No evidence was presented at trial of the increased value to the Property, if any, added by the improvements.

. . . .

6.7     Mr. Graves testified he estimated labor costs for the improvements based on his $90/hour rate as a forester and the amount of time he estimates he spent on improvements. There was no evidence that this rate was reasonable.

6.8     Mr. Graves testified he estimated material costs based on research and information communicated to him by third-parties. There were no receipts or other supporting documents submitted by the Graves to prove material costs.

6.9     Mr. Graves is not a licensed building contractor.

6.10     The Court finds Mr. Graves performed work at the Property to improve the Property. However, the evidence of the value of the improvements is lacking.

CP at 786-87. Based on the FOFs, the trial court's COLs stated, in relevant part:

B.     The Graves' conveyance of the Property to Mr. Castle via Statutory Warranty Deed included the warranty, pursuant to RCW 64.04.030, that Mr. Castle was entitled to the quiet and peaceable possession of the Property with title superior to any person who may claim to have a right in the Property.

C.     The Graves' claim that they have an oral contract affording them the right to acquire the Property from Mr. Castle violates the warranties of the Statutory Warranty Deed.

D.     The Statutory Warranty Deed upon its execution became the full expression of the parties['] intent, and that deed indicates the Property was conveyed to Mr. Castle without any encumbering right by the Graves to reacquire the Property.

E.     Further, the oral contract alleged by the Graves is a purported contract for the future transfer of real estate, which seemingly would take more than one year to perform. RCW 19.36.010 requires agreements that take more than one year to perform to be in writing. RCW 64.04.010 requires any real estate conveyance or contract creating any encumbrance upon real estate to be in writing.

19

The oral contract alleged by the Graves violate[s] the aforementioned statutes, which are generally referred to as the Statute of Frauds.

F.    The Graves' claim[] that they have a right to acquire the Property based on equitable grounds, such as under a constructive trust theory, fail because there is no evidence Mr. Castle acquired the Property wrongfully and allowing such equitable claims in this circumstance would improperly allow the Statute of Frauds to be abrogated.

G.    The only avenue for the Graves to defeat the Statute of Frauds would be to establish there should be an exception to the Statute of Frauds in this case based on part performance of the alleged oral contract.

. . . .

I.    The Graves' claim fails if there is any reasonable explanation for the parties' relationship with respect to the Property other than that of buyer and seller under an oral real estate contract.

J.    Here, the Graves have not established by clear, cogent, and convincing evidence there was a contract in the first instance. The Graves have not proven by clear, cogent, and convincing evidence there was a meeting of the minds between themselves and Mr. Castle for Mr. Castle to transfer the Property to the Graves at some point in the future.

K.    Moreover, every contract requires consideration. The Graves have not proven by clear, cogent, and convincing evidence the alleged oral contract contained consideration.

L.    Nor have the Graves established by clear, cogent, and convincing evidence the requisite terms for a real estate contract.

M.    Additionally, the Graves have failed to establish by clear, cogent, and convincing evidence the partial performance of the alleged oral contract—even to the extent a valid contract had existed. The relationship between Mr. Castle and the Graves can reasonably be explained as that of landlord and tenant.

N.    Mr. Castle is the titled owner of the Property by Statutory Warranty Deed conveyed by the Graves. This fact is enough to end the discussion. Although a moot point, the Court has nevertheless analyzed the Graves' alleged oral contract and found the Graves have failed to prove both the existence of a valid contract, and failed to prove partial performance of the alleged oral contract even if a valid contract had been orally agreed.

O.        Additionally, the equities favor Mr. Castle.  He paid a fair price for the Property.  And the Graves used the purchase money for their benefit.  It is not inequitable in any way for Mr. Castle (or his Estate) as the titled owner of the Property to receive rent payments, to use rent payments to help pay the mortgage, and then sell the Property and realize the value of the Property's appreciation.

P.        Further, the Graves received value for their payments to Mr. Castle because they received a place to live for the past fifteen years.  It is not inequitable that they paid rent for their lodging.  It is not inequitable that a tenant should move and find another place to live if their landlord desires to sell the property.

Q.        There is no evidence the Graves had the ability to buy the Property, or any other property, after they sold the Property to Mr. Castle.  The equities do not favor the Graves receiving a $70,000 gift from their landlord and being able to acquire their landlord's equity in the Property.

R.        The Graves did not plead adverse possession as a Counterclaim, but listed adverse possession as an affirmative defense to the Estate's ejectment claim.  Permission defeats adverse possession.  The evidence indicates the Graves had Mr. Castle's permission to occupy the Property in consideration of rent payments.  There is no consideration for a sale contract for the Property to be conveyed back to the Graves, but the Graves['] periodic payments are consideration for rent.  It is not hostile to occupy a landlord's property and pay the landlord rent.

S.        The Estate has established it owns the Property, the Graves occupy the Property, and the Graves refuse to leave.  An ejectment action was proper.  There was no need for an unlawful detainer action to handle this case in an expedited proceeding, and there is no requirement for the Estate to prove the Graves are any specific type of tenants.

T.        The Graves' claims and affirmative defenses fail.

U.        The Estate is entitled to sell the Property.

V.        The Estate is entitled to a Writ of Ejectment requiring the Graves to vacate the Property.

W.        The Court has authority to issue a Writ of Ejectment upon presentation.

X.        The Graves are not entitled to any award for alleged improvements.  The Graves failed to establish it would be unjust for the Estate to receive the value,

21

if any, of the improvements. The Graves failed to establish Mr. Castle had an appreciation or knowledge of the alleged benefit conferred by the improvements. Further, the Graves did not meet their burden of proof to establish the value of improvements.

CP at 787-90. Accordingly, the trial court entered a judgment against the Graves and ordered a writ of ejectment.

The Graves appeal.

## ANALYSIS

The Graves argue that the trial court erred by excluding testimony from the Graves regarding their agreement with Castle because the Estate had waived the Deadman's Statute. The Graves also challenge many of the trial court's FOFs and COLs. Additionally, the Graves argue that the trial court failed to address, or in the alternative erred in rejecting, the Graves' quasi contract claim; the trial court erred by finding a landlord-tenant relationship; and the trial court erred by rejecting the Graves' adverse possession claim.

A. WAIVER OF THE DEADMAN'S STATUTE

The Graves argue that the trial court erred by excluding testimony from Paul and Patricia regarding their transaction with Castle because the Estate had waived application of RCW 5.60.030 (the Deadman's Statute). Specifically, the Graves contend that the Estate waived the Deadman's Statute when Castle-Smith "introduced numerous documents attempting to explain her theory that the transaction between Graves and Castle was rental and not a refinance" and when she "testified extensively at trial on her direct examination and in cross[-]examination, attempting to show that payments Graves made to Castle were designated as rent." Amend. Br. of Appellant at 17.

1.      Legal Principles

We review evidentiary determinations for abuse of discretion. *Peralta v. State*, 187 Wn.2d 888, 894, 389 P.3d 596 (2017). "'A trial court abuses its discretion when it exercises it on untenable grounds or for untenable reasons.'" *Harbottle v. Braun*, 10 Wn. App. 2d 374, 394, 447 P.3d 654 (2019) (quoting *Farah v. Hertz Transporting, Inc.*, 196 Wn. App. 171, 181, 383 P.3d 552 (2016)), *review denied*, 194 Wn.2d at 1018 (2020).

The purpose of the Deadman's Statute is "to prevent interested parties from giving self-serving testimony regarding conversations and transactions with the deceased because the dead cannot respond to unfavorable testimony." *Kellar v. Estate of Kellar*, 172 Wn. App. 562, 574, 291 P.3d 906 (2012), *review denied*, 178 Wn.2d at 1025 (2013). Testimony about transactions or communications with the decedent can include testimony that goes to the heart of the claims and matters directly at issue even though not about the specific transaction. *Bentzen v. Demmons*, 68 Wn. App. 339, 345-46, 842 P.2d 1015 (1993).

Under the Deadman's Statute, in an action where the adverse party sues as representative of a deceased person:

> [A] party in interest or to the record, shall not be admitted to testify in his or her own behalf as to any transaction had by him or her with, or any statement made to him or her, or in his or her presence, by any such deceased . . . person.

RCW 5.60.030. An interested party is one who stands to either gain or lose as a direct result of the judgment. *See Rabb v. Estate of McDermott*, 60 Wn. App. 334, 340, 803 P.2d 819 (1991).

When determining whether testimony concerns a transaction covered by the statute, the test is "whether the deceased, if living, could contradict the witness of his own knowledge." *In re Estate of Lennon*, 108 Wn. App. 167, 178, 29 P.3d 1258 (2001). However, an interested party

may testify as to their own acts or testify as to their own feelings or impressions, "so long as they do not concern a specific transaction or reveal a statement made by the decedent." *Kellar*, 172 Wn. App. at 575. The Deadman's Statute does not prohibit documentary evidence, but it may limit testimony about the documents. *Id.*; *Wildman v. Taylor*, 46 Wn. App. 546, 553, 731 P.2d 541 (1987).

The Deadman's Statute may be waived. *Thor v. McDearmid*, 63 Wn. App. 193, 202, 817 P.2d 1380 (1991). A party can waive the protections of the Deadman's Statute by: "(a) failure to object, (b) cross[-]examination which is not within the scope of direct examination, and (c) testimony favorable to the estate about transactions or communications with the decedent." *Id.*; *Kellar*, 172 Wn. App. at 577. "Once the protected party has opened the door, the interested party is entitled to rebuttal." *Bentzen*, 68 Wn. App. at 345.

2.     Waiver

We first address the Graves' argument that the Estate had waived any protection under the Deadman's Statute based on the Estate's production of documentary evidence that explained the transaction between Castle and the Graves was a rental arrangement rather than a refinance. The Graves fail to show that the Estate, by seeking admission of documentary evidence, opened the door to testimony otherwise excluded by the Deadman's Statute.

"The appellant has the burden of perfecting the record so that the court has before it all the evidence relevant to the issue." *In re Marriage of Haugh*, 58 Wn. App. 1, 6, 790 P.2d 1266 (1990) (citing RAP 9.2(b)). Because the Graves fail to include any trial exhibits which they allege waived the Deadman's Statute, the record is insufficient for us to review this challenge. *See Olmsted v. Mulder*, 72 Wn. App. 169, 183, 863 P.2d 1355 (1993) ("We cannot reach the merits of [appellant's]

arguments because he has failed to provide us with a sufficient trial record."), *review denied*, 123 Wn.2d 1025 (1994). More significantly, even if the Graves had included the documents in the record, RCW 5.60.030 does not bar documentary evidence. *Kellar*, 172 Wn. App. at 575. To the extent the Graves contend that the Estate opened the door by introducing these documents alone, their challenge fails.

Next, the Graves argue that the Estate waived the protections of the Deadman's Statute when Castle-Smith testified about the admitted documents and when she testified that Castle told her he had "'tenants.'" Amend. Br. of Appellant at 18. But here, it was the Graves who called Castle-Smith to testify in her capacity as the personal representative of the Estate. And it was the Graves who elicited the following testimony from Castle-Smith:

> [GRAVES' COUNSEL:] Okay. What evidence do you have that they're renters?
>
> [CASTLE-SMITH:] Numerous checks that they provided to my father at the time of his—when he was still alive. All of the stubs say either rent or lease.
>
> . . . .
>
> [GRAVES' COUNSEL:] . . . [W]hat other evidence do you have that . . . the Graves were renting the property?
>
> [CASTLE-SMITH:] His income tax returns say rent. His rental logs say rent. He told me he had tenants in the house. A tenant infers a rental. He had a landlord [insurance] policy.
>
> . . . .
>
> [GRAVES' COUNSEL:] . . . I believe your testimony was that, specific to this property [Castle] said he had tenants; is that right?
>
> [CASTLE-SMITH]: That is correct.
>
> [GRAVES' COUNSEL:] Okay. Did he tell you who the tenants were?

[CASTLE-SMITH:] I knew who the tenants were.

[GRAVES' COUNSEL:] Okay. He didn't tell you who they were?

[CASTLE-SMITH:] He did not tell me who they were.

1 VRP (July 30, 2024) at 56-70. The Graves then asked Castle-Smith on direct examination about her reasons for believing the Graves were tenants, which elicited responses from Castle-Smith about her impressions from serving as personal representative of the Estate and about a statement Castle made to her when he was still living about his having tenants in the property.

Waiver is intended to prevent the representative from using the other party to aid the estate's claim. And this intention is demonstrated through the application of the waiver doctrine. For example, waiver resulting from the introduction of testimony typically occurs when *the estate* calls the opposing party as a witness and examines the opposing party on statements and issues otherwise prohibited by the Deadman's Statute, or on cross-examination when *the estate* questions the opposing party about the transaction beyond the scope of direct examination about statements made by the deceased. *See e.g., Johnson v. Peterson*, 43 Wn.2d 816, 819, 264 P.2d 237 (1953) ("Plaintiff [administratrix of the estate] waived the bar of the statute by examining defendant [interested party] as we have stated.").

This case presents a circumstance relating to the Deadman's Statute where the holder of the protections provided by the Deadman's Statute (here, the Estate) did not affirmatively elicit testimony in their case in chief about something the deceased said to them or use the opposing party to introduce statements made by the decedent to waive the protections. Instead, here, we have the circumstance where the Estate's personal representative was called to testify by the opposing party (here, the Graves), and the Graves affirmatively asked questions that caused the

Estate's personal representative to answer in a manner that raises the question of waiver of the Deadman's Statute. Regardless, even if we assume without deciding that the Estate waived the protections of the Deadman's Statute under these circumstances, any error by the trial court was harmless because the Graves have failed to show prejudice.

### 3. No Prejudicial Error

The Estate argues that even if the trial court erred in excluding the testimony, any error was harmless because the Graves' testimony would not have clearly, cogently, and convincingly established an oral contract, as opposed to a rental arrangement. We agree.

When a trial court makes an erroneous evidentiary ruling, we do not reverse a verdict unless the error was prejudicial. *Diaz v. State*, 175 Wn.2d 457, 472, 285 P.3d 873 (2012). An error is prejudicial if it would affect the outcome of the trial. *Id.*

If the Graves had been permitted to testify about their transaction with Castle, the Graves would presumably have testified about the terms of the oral agreement they allegedly had with Castle. However, this alleged oral agreement would be governed by the statute of frauds because it involves a conveyance of real estate. RCW 64.04.010, .020.

Every conveyance of real estate and any interest or encumbrance on real estate must be by written deed, signed by the grantor, and have the grantor's signature acknowledged. RCW 64.04.010, .020; *Berg v. Ting*, 125 Wn.2d 544, 551, 886 P.2d 564 (1995). The Graves claim that they had an agreement with Castle, under which Castle would transfer title to the property back to the Graves. There is no evidence that any such agreement was documented. Thus, because this would have been an oral agreement that involves a conveyance of the property, the alleged agreement would violate the statute of frauds.

When an agreement conveying real property does not comply with the statute of frauds because it is not in writing, it may be proved and specifically enforced if there is sufficient part performance of the agreement. *Id.* at 556. Courts examine three factors to determine if there has been part performance of the oral agreement involving the conveyance of real property such that the agreement may be enforced without complying with the statute of frauds: "'(1) delivery and assumption of actual and exclusive possession; (2) payment or tender of consideration; and (3) the making of permanent, substantial and valuable improvements, referable to the contract.'" *Id.* (quoting *Kruse v. Hemp*, 121 Wn.2d 715, 724-25, 853 P.2d 1373 (1993). Where a party seeks specific performance, the contract must "'be proven by evidence that is clear and unequivocal and which leaves no doubt as to the terms, character, and existence of the contract.'" *Id.* at 556 (quoting *Miller v. McCamish*, 78 Wn.2d 821, 829, 479 P.2d 919 (1971)).

Here, the trial court stated in COL M[4] that "the Graves have failed to establish by clear, cogent, and convincing evidence the partial performance of the alleged oral contract—even to the extent a valid contract had existed." CP at 789. In other words, the Graves' evidence of part performance did not clearly and unequivocally show "'the terms, character, and existence of the contract.'" *Berg*, 125 Wn.2d at 557 (quoting *Miller*, 78 Wn.2d at 829). Moreover, other witnesses were allowed to testify as to what their impressions were of the alleged oral agreement, but the trial court found their testimony to be not credible or failed to provide any details about the specific

---

[4] The Graves challenge COL M. However, the Graves only challenge COL M to the extent that it concludes the relationship between Mr. Castle and the Graves can reasonably be explained as that of landlord and tenant. Accordingly, the remainder of COL M is the law of the case. *Rush v. Blackburn*, 190 Wn. App. 945, 956, 361 P.3d 217 (2015); *King Aircraft Sales, Inc. v. Lane*, 68 Wn. App. 706, 716, 846 P.2d 550 (1993).

terms of an agreement. *See* CP at 780-81 (FOFs 4.3, 4.4, 4.5, 4.6, 4.10, and 4.11).[5] Accordingly, the trial court considered whether the Graves had established part performance such that the oral contract would be removed from the statute of frauds and properly determined that, even assuming there was a valid oral contract, part performance had not been shown.

Accordingly, because the Graves' alleged oral agreement with Castle would be governed by the statute of frauds, any terms the Graves would have testified about would not have changed the outcome of the case. Therefore, any alleged error was not prejudicial.

B. CHALLENGED FINDINGS OF FACT AND CONCLUSIONS OF LAW

We next address the Graves' challenge to the trial court's FOFs and COLs.

The Graves assign error to multiple FOFs. Specifically, the Graves challenge the following FOFs: 2.1, 2.3, 2.5, 3.1, 4.2, 4.3, 4.8, 4.9, 4.10, 4.11, 4.14, 4.27, 4.28, 4.29, 5.1, 5.3, 5.14, 5.15, 5.16, 5.17, 5.19, 6.7 and 6.10.

However, the Graves do not provide any argument related to FOFs 2.3, 2.5, 3.1, 4.2, 4.3, 4.8, 4.9, 4.10, 4.11, 4.14, 4.27, 4.28, 4.29, 5.1, 5.3, 5.16, 5.17, 6.7, or 6.10. A party must support its assignments of error with argument and authority. RAP 10.3(a)(6). "If a party fails to support assignments of error with legal arguments, they will not be considered on appeal." *Howell v. Spokane & Inland Empire Blood Bank*, 117 Wn.2d 619, 624, 818 P.2d 1056 (1991). Accordingly, without providing any argument to support their challenges, we do not consider the Graves' challenges to these FOFs, and they are considered verities on appeal. The remaining FOFs that are challenged are discussed below.

---

[5] To the extent the Graves have challenged some of these FOFs, those issues are addressed below.

The Graves also assign error to the following COLs: E, F, G, I, J, M, N, P, Q, R, S, T, U, V, W, and X. But the Graves do not provide any argument related to COLs F, G, I, J, N, T, U, V, W, and X. Without argument, we do not consider their challenge to these COLs. RAP 10.3(a)(6); *Howell*, 117 Wn.2d at 624. The remaining COLs that are challenged are discussed below.

1. Legal Principles

"On appeal, we review the superior court's findings of fact after a bench trial for substantial evidence." *Alexandria Real Est. Equities Inc., v. Univ. of Wash.*, 28 Wn. App. 2d 944, 961, 539 P.3d 54 (2023), *review denied*, 2 Wn.3d 1031 (2024). "'Substantial evidence' is the quantum of evidence sufficient to persuade a rational, fair-minded person the premise is true." *Viking Bank v. Firgrove Commons 3, LLC*, 183 Wn. App. 706, 712, 334 P.3d 116 (2014). "If the standard is satisfied, a reviewing court will not substitute its judgment for that of the trial court even though it might have resolved a factual dispute differently." *Sunnyside Valley Irr. Dist. v. Dickie*, 149 Wn.2d 873, 879-80, 73 P.3d 369 (2003). The party challenging a finding of fact has the burden of showing that the finding is unsupported by the record. *Nguyen v. City of Seattle*, 179 Wn. App. 155, 163, 317 P.3d 518 (2014).

"We defer to the trial court's assessment of witness credibility and evidence weight." *Id.* Unchallenged findings of fact are considered verities on appeal. *Alexandria*, 28 Wn. App. 2d at 961.

We review both the trial court's application of facts to law and its legal conclusions de novo. *Viking Bank*, 183 Wn. App. at 712. "But when an appellant challenges conclusions of law not based on the law itself, but rather claiming that the findings do not support the court's conclusions, appellate review is limited to determining whether the trial court's findings are

supported by substantial evidence and, if so, whether those findings support the conclusions of law." *Nguyen*, 179 Wn. App. at 163-64.

        2.        Challenged FOFs

        a.        FOF 2.1

The Graves challenge FOF 2.1,[6] which states: "The Graves sold the Property to Richard Castle in July 2009. Mr. Castle was a good friend of Paul Graves and a landlord and friend of Patricia Graves." CP at 778 (citation omitted). Specifically, the Graves challenge the finding that the property was "'sold.'" Amend. Br. of Appellant at 19.

Here, the evidence shows that the Graves executed a statutory warranty deed, which conveyed the property to Castle. Castle obtained a $200,000 bank loan against the property; paid $50,000 of his own money for the property; paid over $9,000 in closing costs; and paid additional money to the Graves, which covered the Graves' closing costs at the time of transfer. Thus, substantial evidence in the record supports that the Graves "sold" the property to Castle as stated in FOF 2.1.

        b.        FOFs 5.14, 5.15, and 5.19

FOF 5.14 reads:

> If Mr. Castle's estate sells the Property, the Estate will receive the equity in the Property from the mortgage payments and appreciation in value due to the rising real estate market between 2009 and 2024. Further, Mr. Castle and his Estate will have benefitted from the rent payments received from the Graves in the past. This would be consistent with an owner/landlord's rights in residential real property.

CP at 786. FOF 5.15 states:

---

[6] The trial court numbered two FOFs as 2.1, but based on the Graves' briefing, they appear to challenge the quoted finding.

> If the Graves are forced to move out of the Property and find some other place to live, the Graves will not receive any equity from the Property and their past rent payments to Mr. Castle will have benefitted them by securing a place for them to live for the past fifteen years. This would be consistent with being a tenant.

CP at 786. And FOF 5.19 provides: "The Court finds the relationship between Mr. Castle and the Graves can be explained as a landlord-tenant relationship." CP at 786.

The Graves group their arguments regarding FOFs 5.14 and 5.15. The Graves contend that the factual findings are in error because "[t]he undisputed facts are inconsistent with the actions of a landlord and residential tenant" based on the improvements done by the Graves. Amend. Br. of Appellant at 21. In their challenge to FOF 5.19, the Graves argue that the trial court "erred by finding and concluding there was a landlord-tenant relationship between Castle and Graves." Amend. Br. of Appellant at 34.

Here, FOFs 5.14, 5.15, and 5.19 are supported by substantial evidence in the record. Regarding FOF 5.14, the Graves rely on the improvements they made to the property to challenge FOF 5.14. However, the Graves fail to meet their burden to show that FOF 5.14 is not supported by substantial evidence by simply relying on evidence of improvements they made to the property. Rather, substantial evidence shows that Castle had, and the Estate now has, title to the property. The evidence included escrow paperwork, a Real Estate Excise Tax Affidavit, and a Statutory Warranty Deed, which support a finding that the Estate is the owner of the property. Also, there is evidence that the Graves wrote checks to Castle and the Estate where the Graves themselves identified on the check that the payment was for "'rent'" or "'house lease.'" CP at 785. Thus, substantial evidence supports the finding in FOF 5.14 that the circumstance was "consistent with an owner/landlord's rights in residential real property." CP at 786.

The Graves rely on the same argument with regard to FOF 5.15. However, the same evidence discussed above supports the trial court's FOF 5.15. The evidence shows that the Graves do not have title to the property and made payments to Castle and the Estate related to their use of the property. The Graves made the payments by check, the Graves wrote "'rent'" or "'house lease'" on the check payments, and Castle reported the property as a rental on his federal tax returns and loan applications, sometimes specifically identifying the Graves as tenants. CP at 785. Thus, substantial evidence supports FOFs 5.14 and 5.15 because Castle's title to the property and the Graves' payment of "rent" or "house lease" while residing at the property are consistent with an owner's rights and a tenant's use.

For the same reasons, there is substantial evidence to support FOF 5.19. Again, the Graves made payments to Castle and wrote in the memo line that the payment was for "'rent'" or "'house lease.'" CP at 785. Also, Castle held title to the property but allowed the Graves to occupy the property. This evidence supports the trial court's finding that the relationship can be explained as a landlord-tenant relationship.

Thus, the Graves' challenge to FOFs 5.14, 5.15, and 5.19 fail.

3. Challenged COLs

a. COL E

COL E states:

[T]he oral contract alleged by the Graves is a purported contract for the future transfer of real estate, which seemingly would take more than one year to perform. RCW 19.36.010 requires agreements that take more than one year to perform to be in writing. RCW 64.04.010 requires any real estate conveyance or contract creating any encumbrance upon real estate to be in writing. The oral contract alleged by the Graves violate[s] the aforementioned statutes, which are generally referred to as the Statute of Frauds.

33

CP at 788.

Here, the Graves baldly contend that "[t]he court clearly erred in concluding that the oral contract alleged by Graves violated RCW 19.36.010 and RCW 64.04[.010.] [statute of frauds]" Amend. Br. of Appellant at 24. The Graves fail to provide any argument explaining why the trial court erred in concluding that an oral contract of this nature violated the statute of frauds.

Nonetheless, the Graves' challenge fails. Because Castle held title to the property, the contract would constitute a real estate conveyance that is subject to the statute of frauds under RCW 64.04.010 and .020. Moreover, the statute of frauds would apply because the FOFs show that the time required for performance exceeded one year. For example, unchallenged FOFs 4.16 and 4.20 show that the mortgage had a principal balance of over $189,000 in 2011, and the Graves only made seven payments to Castle in 2011 of $1,000 each. Based on the principal balance and amount paid, performance would take longer than one year to perform. Accordingly, COL E is supported by the trial court's FOFs.

> b. COL M, P, Q, and S

COL M states: "[T]he Graves have failed to establish by clear, cogent, and convincing evidence the partial performance of the alleged oral contract—even to the extent a valid contract had existed. The relationship between Mr. Castle and the Graves can reasonably be explained as that of landlord and tenant." CP at 789.

COL P provides:

Further, the Graves received value for their payments to Mr. Castle because they received a place to live for the past fifteen years. It is not inequitable that they paid rent for their lodging. It is not inequitable that a tenant should move and find another place to live if their landlord desires to sell the property.

34

CP at 789. COL Q reads:

> There is no evidence the Graves had the ability to buy the Property, or any other property, after they sold the Property to Mr. Castle. The equities do not favor the Graves receiving a $70,000 gift from their landlord and being able to acquire their landlord's equity in the Property.

CP at 789. COL S provides:

> The Estate has established it owns the Property, the Graves occupy the Property, and the Graves refuse to leave. An ejectment action was proper. There was no need for an unlawful detainer action to handle this case in an expedited proceeding, and there is no requirement for the Estate to prove the Graves are any specific type of tenants.

CP at 790.

The Graves argue that COLs M, P, Q, and S were in error based on the conclusion that "'the relationship between Mr. Castle and the Graves can reasonably be explained as that of landlord and tenant.'"[7] Amend. Br. of Appellant at 28 (quoting CP at 789 (COL M)). The Graves argue that they could not be tenants because there was no rental agreement under RCW 59.18.030(30) and there was "absolutely no evidence at trial presented that there was any established amount of 'rent.'" Amend. Br. of Appellant at 31. Moreover, the Graves argue that Castle was not a "landlord" because he did not perform any of the duties of a landlord under RCW 59.18.060.

Under RCW 59.18.030(34), a "tenant" is "any person who is entitled to occupy a dwelling unit primarily for living or dwelling purposes under a rental agreement." A "landlord" is "the

---

[7] Although the Graves assign error to COLs M, P, Q, and S in their entirety, the Graves only appear to argue that these conclusions were erroneous to the extent they are related to the conclusion that there was a landlord-tenant relationship.

owner, lessor, or sublessor of the dwelling unit or the property of which it is a part." RCW 59.18.030(16). A "rental agreement" is "all agreements which establish or modify the terms, conditions, rules, regulations, or any other provisions concerning the use and occupancy of a dwelling unit." RCW 59.18.030(30).

Here, FOF 2.2 provides that the Graves conveyed the property to Castle by statutory warranty deed. Because Castle has title to the property, he is the owner of the property. Moreover, FOF 5.3 provides that when the Graves occupied the property after Castle obtained title, the Graves sent Castle checks periodically. Several checks stated that the payments were for "'rent'" or "'house lease.'" CP at 785. Also, FOF 5.7 states that Castle referred to the payments as rent in emails with Paul. Accordingly, the Graves were entitled to occupy the property, and the Graves' check payments and Castle's acceptance of the checks, as well as their reference to the payments as rent in correspondence, reflects their rental arrangement. In addition, the trial court made several other FOFs, which are not challenged on appeal and are verities on appeal, that establish Castle (and now the Estate) as the "owner" and that the Graves paid "rent." *See*, *e.g.*, CP at 778-86 (FOF 2.7, 3.4, 3.5, 4.16, 4.18, 4.20, 5.6, and 5.19.)[8]

Thus, although there is no written rental agreement, the trial court's FOFs support the trial court's conclusions in COLs M, P, Q, and S that the relationship between Castle and the Graves can be reasonably explained as a landlord and tenant type relationship.[9]

---

[8] The Graves have challenged FOF 5.19 on appeal. However, as discussed above, substantial evidence supports FOF 5.19; thus, the Graves' challenge to FOF 5.19 fails.

[9] We note that even if the Graves were not "tenants," the Graves' clearly are attempting to claim "title or some interest" in the property; therefore, providing the Estate grounds for bringing an ejectment proceeding against the Graves. *See* RCW 7.28.010.

c.      COL R

COL R states:

> The Graves did not plead adverse possession as a Counterclaim, but listed adverse possession as an affirmative defense to the Estate's ejectment claim. Permission defeats adverse possession. The evidence indicates the Graves had Mr. Castle's permission to occupy the Property in consideration of rent payments. There is no consideration for a sale contract for the Property to be conveyed back to the Graves, but the Graves['] periodic payments are consideration for rent. It is not hostile to occupy a landlord's property and pay the landlord rent.

CP at 790. The Graves contend that "[t]he [trial] court wrongly found that Graves did not prove adverse possession because their use of the Property was permissive and that 'payment of rent' was evidence of permissive use." Amend. Br. of Appellant at 36. The Graves contend that FOF 6.2, which found that the Graves did not ask for permission to improve their property, contradicts the conclusion that their use was permissive.

"The doctrine of adverse possession permits a party to acquire legal title to another's land by possessing the property for at least 10 years in a manner that is '(1) open and notorious, (2) actual and uninterrupted, (3) exclusive, and (4) hostile.'" *Gorman v. City of Woodinville,* 175 Wn.2d 68, 71, 283 P.3d 1082 (2012) (quoting *ITT Rayonier, Inc. v. Bell,* 112 Wn.2d 754, 757, 774 P.2d 6 (1989)). Our Supreme Court held in *Chaplin v. Sanders*, 100 Wn.2d 853, 860-61, 676 P.2d 431 (1984):

> The "hostility/claim of right" element of adverse possession requires only that the claimant treat the land as his own as against the world throughout the statutory period. The nature of his possession will be determined solely on the basis of the manner in which he treats the property. His subjective belief regarding his true interest in the land and his intent to dispossess or not dispossess another is irrelevant to this determination.

However, "[p]ermission, express or implied, from the true owner negates the hostility element because permissive use is inconsistent with making use of property as would a true owner." *Teel v. Stading*, 155 Wn. App. 390, 394, 228 P.3d 1293 (2010).

Here, FOFs 6.1 and 6.2 state that the Graves continued to make improvements to the property after Castle obtained title and that the Graves did not obtain permission to make these improvements. However, there is no dispute that the Graves occupied the property with Castle's knowledge and permission. FOF 5.3 states that during the Graves' occupancy of the property after Castle obtained title, the Graves would send checks to Castle. Some of these checks from the Graves included "'rent'" or "'house lease'" in the memo line. CP at 785. Further, FOF 3.5 states that Castle consistently reported the property as producing rental income since he purchased the property in 2009, and FOF 5.6 states that Castle identified the property as a rental in loan applications with the Graves sometimes specified as tenants. Accordingly, the trial court's FOFs support COL R that the Graves had permission to occupy the property and that the Graves' possession was not hostile.

In sum, the trial court's FOFs challenged on appeal are supported by substantial evidence, and the trial court's challenged COLs flow from those findings. Thus, the Graves' challenges to the trial court's FOFs and COLs fail.

C.      QUASI CONTRACT

The Graves contend that the trial court failed to rule on the Graves' claim that they had formed a quasi contract with Castle. In the alternative, the Graves argue that the trial court erred by ruling that the Graves had not formed a quasi contract with Castle.

Unjust enrichment, a modern term for the older doctrine of quasi contracts, is a doctrine "founded on notions of justice and equity." *Young v. Young*, 164 Wn.2d 477, 484, 486, 191 P.3d 1258 (2008). "Unjust enrichment is the method of recovery for the value of the benefit retained absent any contractual relationship because notions of fairness and justice require it." *Id.* "In such situations a quasi contract is said to exist between the parties." *Id.*

An unjust enrichment claim requires: "'a benefit conferred upon the defendant by the plaintiff; an appreciation or knowledge by the defendant of the benefit; and the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value.'" *Id.* (quoting *Bailie Commc'ns, Ltd. v. Trend Bus. Sys. Inc.*, 61 Wn. App. 151, 159-60, 810 P.2d 12 (1991)).

1.     Trial Court's Ruling

COL F states:

> The Graves' claims that they have a right to acquire the Property based on equitable grounds, such as under a constructive trust theory, fail because there is no evidence Mr. Castle acquired the Property wrongfully and allowing such equitable claims in this circumstance would improperly allow the Statute of Frauds to be abrogated.

CP at 788. The trial court also determined in COLs O and T respectively that "the equities favor Mr. Castle" and that "[t]he Graves' claims and affirmative defenses fail." CP at 789, 790.

Thus, contrary to the Graves' contention, the trial court ruled on the Graves' quasi contract claim, both by concluding that the Graves' claims and affirmative defenses fail and that the equities favor Castle, as well as concluding that there is no evidence supporting the Graves' claim that they have a right to acquire the property on equitable grounds. Because the trial court ruled on the quasi contract claim, we next determine whether the trial court erred by denying this claim.

> 2.     No Quasi Contract

The Graves contend that the trial court "fail[ed] to conclude that the Castle Estate was unjustly enriched," "failed to find an implied contract at law . . . which allowed the transfer [of] the property to Graves after full payoff of the remaining mortgage," and in the alternative, "clearly erred by failing to award Graves the reasonable value of the work they performed." Amend. Br. of Appellant at 27-28.

The Graves' arguments ask this court to reweigh the evidence by contending that "[o]ther than the closing documents, Castle[-]Smith introduced no evidence that this was an arm's length sale transaction;" highlighting the testimony from Wittenberg, Wheeler, Avila, and Guzman to classify the transaction as a refinance; and contending that "the fundamentals of the arrangement were not disputed." Amend. Br. of Appellant at 20. The Graves' arguments are unpersuasive.

For the reasons discussed above, the trial court's factual findings are supported by substantial evidence, and this court will not reweigh the evidence on review. *See Nguyen*, 179 Wn. App. at 163. Moreover, the trial court's FOFs fail to support the Graves' reliance on testimony from other witnesses—"Ms. Guzman did not know any specific terms of an agreement with the Graves," (FOF 4.4); "Ms. Avila testified she could not recall any details of any specific terms of an agreement between Mr. Castle and the Graves," (FOF 4.6); "Mr. Wittenberg testified he did not know any details of specific agreement terms. For example, he did not know how much money the Graves were ultimately supposed to pay Mr. Castle to get the Property back. Mr. Wittenberg testified it was impossible to know the parameters of the agreement between Mr. Castle and the Graves," (FOF 4.10); "Mr. Wheeler testified that at the time the agreement was made he did not know any terms of the agreement," (FOF 4.11). CP at 780, 781.

Here, the Graves' challenge to the trial court's unjust enrichment ruling fails. There is no evidence that the amount of payments made by the Graves was sufficient to pay Castle's mortgage for the property. Also, the evidence at trial showed that Castle held title to the property and Paul made some improvements to the property after Castle had obtained title. This evidence can show that the Graves conferred a benefit upon Castle based on the improvements; however, the Graves fail to show that Castle was aware of or appreciated the benefit. The evidence shows that the Graves did not seek permission to make improvements—they did not request permission from Castle or obtain permits. Moreover, as noted, there is no evidence that Castle had any knowledge of improvements to the property. In fact, the trial court found in FOF 6.3 that there was no evidence Castle was aware of the improvements, which is not challenged on appeal. Accordingly, the trial court did not err in denying the Graves' equitable claims.

The Graves also argue that the trial court abused its discretion by denying any relief to the Graves and contend that this court should take the unrefuted testimony surrounding the Graves' improvements as a verity. However, because we will not reweigh the evidence and because the trial court found in FOF 6.3 that there was no evidence Castle was aware of the improvements, there was no unjust enrichment to support an equitable remedy.

The Graves further argue that the trial court "failed to find an implied contract at law/quasi-contract which allowed the transfer [of] the property to Graves after full payoff of the remaining mortgage" under a constructive trust theory. Amend. Br. of Appellant at 27-28. Constructive trusts, which are typically imposed in cases of fraud, misrepresentation, bad faith, or overreaching, arise "'where the retention of the property would result in the unjust enrichment of the person retaining it.'" *Consulting Overseas Mgmt., Ltd. v. Shtikel*, 105 Wn. App. 80, 87, 18 P.3d 1144

41

(2001) (quoting *Scymanski v. Dufault*, 80 Wn.2d 77, 89, 491 P.2d 1050 (1971)), *review denied*, 145 Wn.2d 1003 (2001). Because there was no unjust enrichment, the Graves' constructive trust argument fails.

D.    LANDLORD-TENANT RELATIONSHIP

The Graves argue that the trial court erred by finding a landlord-tenant relationship "because the facts are inconsistent with the definition and requirements of that relationship under the Residential Landlord Tenant Act (RCW 59.18)." Amend. Br. of Appellant at 28.

The Graves contend that the Estate failed to show clear terms of an agreement, did not argue a specific type of tenancy, and could not show Castle was a landlord because he did not perform the duties of a landlord. However, as previously discussed, substantial evidence supports the FOFs that the relationship between Castle and the Graves could be classified as a landlord-tenant relationship. In addition, the Estate was not required to prove a specific type of tenancy for an ejectment action. *See* RCW 7.28.010 ("Any person having a valid subsisting interest in real property, and a right to the possession thereof, may recover the same by action . . . to be brought against the tenant in possession; if there is no such tenant, then against the person claiming the title or some interest therein."). Moreover, whether Castle performed the duties of the landlord does not affect the formation of a landlord-tenant relationship. Rather, Castle's failure to perform those duties would merely allow the Graves to pursue remedies, such as those outlined in RCW 59.18.100.

The Graves also argue that any rental agreement was an illusory promise such that it was unenforceable. "An illusory promise is one that is so indefinite that it cannot be enforced, or by

its terms makes performance optional or entirely discretionary on the part of the promisor." *Lane v. Wahl*, 101 Wn. App. 878, 882, 6 P.3d 621 (2000).

The Graves appear to contend that any rental agreement was illusory because the payment amount varied and the Graves missed payments or made extra payments. But here, the evidence shows that the Graves periodically sent Castle payments to continue occupying the property. Castle accepted the payments from the Graves and allowed the Graves to continue occupying the property. The fact that the payment amount changed since 2009 does not render any promise illusory, nor does the fact that the Graves sent checks to Castle on different dates. Accordingly, the Graves' challenge fails.

E.    ADVERSE POSSESSION

Finally, the Graves argue that the trial court erred by rejecting their adverse possession affirmative defense. As previously discussed, the Graves were permitted to use the property such that their possession could not have been hostile.

Moreover, the Graves' reliance on *LeBleu v. Aalgaard*, 193 Wn. App. 66, 371 P.3d 76 (2016) is misplaced. *LeBleu* is a Division 3 case discussing permissive use based on a prior agreement regarding boundary lines between neighbors. *Id.* at 69, 76. The occupancy arrangement between the Graves and Castle is distinguishable from the boundary agreement discussed in *LeBleu*, and we are not bound by *LeBleu*. *See In re Pers. Restraint of Arnold*, 190 Wn.2d 136, 148-49, 410 P.3d 1133 (2018).

Here, substantial evidence supports the finding that the Graves had Castle's permission to occupy the property in exchange for their payments to Castle. Accordingly, the Graves cannot

establish that the possession was hostile. Therefore, the trial court did not err in rejecting the Graves' adverse possession claim.

CONCLUSION

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Veljacic, C.J.

Che, J.